**Jorge R. MARTIN et al., Plaintiffs, Appellants,**

v.

**The VECTOR COMPANY, INC. Defendant, Appellee.**

**No. 73–1249.**

United States Court of Appeals, First Circuit.

Argued Feb. 7, 1974.

Decided May 16, 1974.

Rehearing Denied June 26, 1974.

Herman W. Colberg, San Juan, P. R., with whom Reichard & Colberg, San Juan, P. R., was on brief, for appellants.

Garrard Harris, Rio Piedras, P. R., for appellee.

William M. Simmons and von Baur, Coburn, Simmons & Turtle, Washington, D. C., for appellee.

Before COFFIN, Chief Judge, McEN-TEE and CAMPBELL, Circuit Judges.

LEVIN H. CAMPBELL, Circuit Judge.

On July 9, 1969, Vector Company and the individual plaintiffs entered into a written agreement (the Agreement).[1]

I.     "PURCHASE AGREEMENT"

AGREEMENT entered into this 9th day of July, 1969, by and between MR. JAIME SALICRUP and his wife, MARIA TERESA FOS; MR. JORGE R. MARTIN and his wife, CONSUELO SURIA; MR. EMILIO J. VENEGAS, and his wife, MARIA DEL CARMEN VILARO (hereinafter collectively referred to as the "SELLER") and VECTOR CO., INC. a corporation (hereinafter referred to as "The Buyer").

1. Seller is the owner of a certain parcel of land located in Ponce, Puerto Rico, more particularly described in Schedule "A", attached hereto, and made a part hereof (hereinafter referred to as "The Property"). Seller has submitted to the Urban Renewal Housing Corporation (hereinafter referred to as "URHC") a proposal to construct on the property approximately THREE HUNDRED AND FIFTY dwelling units for rental to low or moderate income families. Seller desires to sell the property to Buyer for the construction of such project and the Buyer is willing to purchase the same, provided such Governmental approvals necessary for the construction of such project are obtained. Accordingly, Seller hereby agrees to sell to Buyer the property for a purchase price to be determined as follows:
(i) Four Hundred ($400.00) Dollars per unit, plus (ii) the amount of the value of the property as determined by two independent appraisers chosen by URHC, provided, however, that the minimum value of the property shall not be less than $5.00 per square meter; (iii) the purchase price of that portion of the property lying outside of the project shall be FOUR THOUSAND ($4,000.00) DOLLARS per acre. Such sale shall be upon the terms, conditions, representations and warranties contained herein and in the form of Deed of Purchase and Sale attached hereto, made a part hereof and marked Exhibit "B".

2. The closing hereunder shall take place at two o'clock in the afternoon of the fifteenth business day after the execution of the contract as provided in paragraph 4(a) hereof, subject to the condition that all of the representations and warranties [made] shall at the closing hereunder be true and correct.

3. The Seller represents and warrants the Property is recorded in the Registry of Property of Puerto Rico; that it is the owner in fee simple (*pleno dominio*) of the Property and that the Property is free and clear of all mortgages, tenancies, liens, encumbrances and rights of third parties whatsoever and that the real property taxes applicable to the Property have been fully assessed and paid through June 30, 1969.

Plaintiffs agreed to sell and Vector to buy a tract of land in Ponce, Puerto Rico, at a price fixed by a formula not now in dispute. Several years later plaintiffs sued in the Superior Court of Puerto Rico for specific performance, and the case was removed to the district court where it was tried. The district court denied specific performance, and plaintiffs appeal.

The facts, which we recite in detail, are largely undisputed. Plaintiffs had accumulated the tract in question intending that it should be developed and sold to Puerto Rico Urban Renewal and Housing Corporation (URHC) for low-cost "turnkey" housing. Under the "turnkey" program a private developer with access to a site makes a preliminary proposal to sell to the local housing authority a completely developed project. If the authority accepts, the developer then works closely with it developing detailed plans, specifications and more precise estimates. See 24 C.F.R. § 275.-6(b). The plans proceed through various stages of approval by the local authority and the Department of Housing and Urban Development (HUD), and after the design and price are finally settled, the developer and local authority enter into a contract under which the latter agrees to purchase the land and described buildings and improvements for a set figure. The contract is backed by HUD's financial commitment, and once it has been signed, the developer is able to secure commercial construction financing. He constructs the buildings and improvements, and eventually delivers the property to the local authority against payment of the agreed price.

Plaintiffs early in 1969 proposed to develop the land and sell the completed project to URHC for an estimated price of $5,565,000. URHC and the local HUD office approved, and some preliminary appraisal activity may have taken place. The district court found,

"At this stage of the proceeding plaintiffs could have engaged a contractor to build the houses in accordance with the plan approved by HUD and it would then have sold the entire project, ready for occupancy, to URHC for the sum of money which had previously been authorized by the local housing authority and HUD. This price would have been equal to that which HUD had agreed was a proper estimate for the completion of the project, covering the cost of the

4. At the closing hereunder the Seller and the Buyer will execute a deed of Purchase and Sale substantially in the form of Exhibit "B" hereto, . . . .

5. Notwithstanding anything contained herein, the Buyer shall have no obligation hereunder unless the following conditions are satisfied in full:

(a) It shall have executed a contract with the URHC in accordance with the Low Rent Housing Manual No. 221.1, dated December, 1968, as amended and/or as may be revised from time to time, and more specifically, Exhibit No. 12, thereto entitled "Contract of Sale," Form . . . HUD—53015.

(b) Seller, at its sole cost and expense, shall have furnished to Counsel for the Buyer, an opinion of counsel for the Seller to the effect that the Seller (i) owns the Property, free and clear of all liens and encumbrances (ii) has good and marketable dominion title to the Property.

In the event that the conditions contained in this paragraph shall not be duly met and complied with, or in the event that any of the representations or warranties contained herein or in Exhibit "B" hereto shall not be true and correct at the time of closing hereunder and shall not be waived in writing to the Buyer, the Buyer shall have the right to terminate this Agreement and its obligations hereunder.

6. [No broker's commissions.]

7. The parties hereto agree to execute and deliver such additional instruments and documents at and after the closing hereunder as may be necessary to carry out the terms and intent of this Agreement.

8. All notices, demands and communications hereunder shall be served or given by registered or certified mail . . .

9. The Buyer shall have the right to assign all of its rights hereunder to another corporation affiliated to it by stock ownership, by notice to the Seller prior to the closing.

10. This Agreement shall be binding upon, and inure to the benefit of, the parties hereto and their respective successors and assigns, and shall be interpreted in accordance with the laws of the Commonwealth of Puerto Rico.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement effective the date first set out above."

land, the construction, architects' fees and other services, and the necessary costs incidental to the final completion of the project. On the other hand, the plaintiffs could sell the project as a package to someone else who, presumably, might be interested in taking the project over on the assumption that it could complete it and execute a contract of sale to URHC at a figure in excess of what it had agreed to purchase it for from the plaintiffs, plus the costs of completion."

Plaintiffs chose the second alternative and found an interested party in Vector, a firm which had developed a great number of turnkey projects, most of them in the mainland United States. Its two chief executive officers concluded with plaintiffs the Agreement here sought to be enforced. It was drafted by Vector's Puerto Rico counsel and executed in counsel's office.

Arrangements with URHC were in their formative stages when the Agreement was signed. Plaintiffs and Vector's local representative worked with URHC and HUD to refine the plans and secure the approvals needed before Vector could execute a contract with URHC and take over the project. Proposals were made, and were accepted by URHC and HUD, to increase the number of housing units from 350 to 396 and to increase the total project price. In September, 1970, a feasibility conference was held with government officials at which preliminary plans and pricing were reviewed. URCH and HUD agreed to increase the total project price to a figure in excess of $6,200,000. These changes in units and price were entirely agreeable to Vector, which stood to benefit from them. The district court found that Vector acquiesced and in December, 1970, confirmed by letter its desire to proceed.[2]

Early in January, 1971 Vector's principals met with plaintiffs. The district court found "as a fact" that plaintiffs told Vector's president that they had received from another party an offer for the project which would net them more than was called for in the Agreement, but that Vector insisted upon its right to the property. Plaintiffs complained

2. On November 28, 1970 plaintiffs wrote to Vector:

"On July 9, 1969 The Vector Company, Inc. thru it President Mr. Earl S. Worsham and the Sponsors and Owners of the above TURNKEY PROJECT, entered into an agreement to sell the above subject project to THE VECTOR COMPANY, INC..

1. At the time the negotiation was made it was based on a proposal for 350 units at a total cost of $5,565,000.00 as total purchase price.

2. Since then number of units has been changed to 396 units with a total cost of $6,225,570.00.

3. During all the changes and proposals were always reviewed before submittal with your Representative in Puerto Rico Engineer Pedro Jimenez. At this moment proposal has been approved both by [URHC] and H.U.D.,—it is only awaiting approval from Washington which should be forthcoming in the next two weeks, when preliminary Contract of Sale will be issued by [URHC], —but since inasmuch as original proposal or present proposal varies both number of units and dollar value,—we wish for you to ratify intent of purchase upon receipt of this letter and confirm willingness for transaction upon receipt of [URHC] Preliminary Purchase Order.

Hoping to hear from you in the next ten (10) days, we remain,

Yours very truly,

LA YUCA DEVELOPMENT CORPORATION"

Vector responded on December 14:

"This will serve to confirm our telephone conversation of December 9th with Mr. Dexter at which time we indicated that we were definitely interested in the La Yuca project and would formally advise you within a couple of days.

. This will serve to confirm our intention to ratify the purchase of the above referenced turnkey project in accordance with the Agreement executed on July 9th between our mutual organizations.

Please send us copies of your preliminary drawings and any additional information you may have regarding your most recent proposal on the above referenced turnkey. Please contact us through our representative, Mr. Pedro Jimenez, as soon as you are in receipt of the Preliminary Contract of Sale.

Very truly yours.

THE VECTOR COMPANY, INC."

that the sale provided for under the Agreement had not yet been consummated. Vector's people responded that they had not been able to obtain bids for completion of the project because they had not yet received detailed plans and specifications then being prepared by the architects.

Upon receipt of the plans and specifications later in January, Vector submitted them to various contractors but, as the district court found, was unable to obtain bids that would permit Vector to break even under the commitment from URHC. Plaintiffs, meanwhile, had secured approval from URHC to substitute Vector as the developer; they advised Vector, and submitted evidence at trial, of their desire and ability to perform the Agreement. Vector does not seriously question plaintiffs' offer and ability to perform, or URHC's willingness to have contracted with Vector at a figure in the neighborhood of $6,225,570.[3]

Vector's defense is that the July, 1969 contract was, in essence, an option which Vector had an unqualified right not to exercise. Vector points to the fact that it never executed a contract of sale with URHC, and that under clause 5(a) it has no obligation to purchase unless it did so. Vector's reason for not so doing, as stated in its answer, is that in order to execute a contract with URHC, it had to find "a bondable contractor willing to construct the project at a price which would leave a profit for defendant. Such contractor has not been found and therefore the prerequisites of the Purchase Agreement has not been satisfied."

■ We can dispose of the "option" argument rather rapidly, as did the district court. The terminology and structure of the Agreement, which was prepared by an attorney and was between sophisticated businessmen, is of purchase and sale. "Seller" agrees to sell and "Buyer" states that it is "willing to purchase the same, provided such governmental approvals necessary for the construction of the project are obtained." There is to be a closing "at two o'clock in the afternoon of the fifteenth business day after the execution of the contract as provided in paragraph 4 (a)."[4] Had Vector been granted an option, its duration would presumably have been set forth and there would have been consideration for plaintiffs' willingness to restrict alienage of the property without any assurance that Vector would buy. *See* Rossy v. Superior Court, 80 P.R.R. 705 (1958); 1A A. Corbin, Contracts §§ 263, 269, 274 (1963).

■ The district court likewise rejected, as do we, Vector's argument that, under clause 5(a), it possessed an absolute right, for any or no reason, to decline to complete a contract with URHC, and could raise its own default to avoid a duty to purchase from plaintiffs. Such a literal reading either would make the contract a pure option—a reading we have rejected—or would expose clause 5(a) to Article 1072 of the Civil Code of Puerto Rico:

> "The condition shall be considered as fulfilled when the obligated party should voluntarily prevent its fulfillment." 31 L.P.R.R. § 3047.

3. Vector admitted in its answer the following allegations in paragraph 4 of the complaint:
"That plaintiffs have complied with all of its obligations under the aforementioned contract and have been and are ready and desirous of executing the deed and corresponding purchase and sale contract, but have not been able to do so due to the fact that the defendant, VECTOR CO., INC., has refused and refuses to comply with its obligations of buying and paying the corresponding and agreed to price."

4. We believe the district court to be mistaken in reading this language, as it did, to call for

a closing within two weeks after *the Agreement* was signed. The draftsman meant, we think, to refer to paragraph 5(a); the closing is to be within 15 days after Vector signed the URHC contract. Neither URHC nor Vector could possibly have entered into the URHC contract in July, 1969—final plans had not been prepared and approved and it remained open to URHC and HUD to back out. Vector, as shown in clause 5(a), had no intention whatever of buying plaintiffs' property until it had a binding contract with URHC.

Or as the Louisiana court has said,

> ". . . the condition is considered as accomplished, when the debtor, whose obligation depends on this condition, prevents the accomplishment of it . . . . the law does not permit the party whose obligation depends on a condition to allege the non-performance of that condition in defense, where it was through his fault it was not performed." Walls v. Smith, 3 La. 498 (1832).

Under the civil law a condition is deemed "performed" when nonperformance is utterly within the control of one of the parties. *See* A. Corbin, Contracts § 149 n. 74 (1963), § 767 (1960). *See also* Article 1068, 31 L.P.R.A. §§ 3043, 3373. However, like the district court, we think the 5(a) condition was not meant to be read so literally as to put nonperformance utterly within Vector's control. We construe it, rather, as imposing some degree of duty upon Vector.

The district court found that Vector's duty under the Agreement was

> "within a reasonable time [to] make a good faith effort to complete the final steps that were necessary to put itself in a position to offer to URHC an acceptable contract of sale if it could do so by the exercise of reasonable business judgment, but that it was not obligated to complete the purchase from the plaintiffs if its failure to make a contract of sale with URHC resulted from its inability successfully to carry out its obligations just stated."

In keeping with this theory the court found that Vector, by expending money to make rough plans, obtaining cost "take offs", and approaching contractors, made "a reasonable effort to place itself in a position where it could do the act which would satisfy the condition." Having done so, and the condition re-

maining unsatisfied, the court concluded that Vector need do no more.

█ We do not disagree with much or even most of the above. Our difficulty arises insofar as the court determined that Vector's duty to make good faith, reasonable efforts to contract with URHC was discharged by the anticipated unprofitability of the transaction. We believe the court erred in reading into the Agreement a condition of profitability.

█ We are prepared to assume that the interpretation of an instrument, and in particular a condition, as troublesome as this, calls for an inquiry more "factual" than "legal", *see* 3 A. Corbin, Contracts § 554 (1960); *but see* Seaboldt v. Pennsylvania R. R., 290 F.2d 296 (3d Cir. 1961); Taylor v. Gowetz, 339 Mass. 294, 158 N.E.2d 677, 680 (1959). Thus we must observe the "clearly erroneous" standard of F.R.Civ.P. 52(a). We would not substitute our interpretation for that of the trier if the language were reasonably capable of the meaning he found, particularly if that meaning were to be supported by extrinsic evidence of the parties' intent. We have sought, therefore, for all facts and principles which might lend support to the finding of an implied condition of profitability the frustration of which justifies nonperformance of the Agreement.

█ But we are confronted at the beginning with a well-accepted rule of construction in the commercial law that the obligor under a contract takes the risk of increase in the cost of performance,[5] unless the contract provides otherwise. Peerless Casualty Co. v. Weymouth Gardens, Inc., 215 F.2d 362 (1st Cir. 1954). Although the American Law Institute has proposed in § 281 of its Restatement (Second) of Contracts (Tent.Draft No. 9) (1974) that an obligor may avoid his performance after the occurrence of an event, "the non-occurrence of which was

---

5. *Cf.* Tsakiroglou & Co. v. Noblee & Thorl G. m. b. H., 2 All E.R. 179 (H.L.1961) (increase in shipping costs caused by Suez Canal closing); Lloyd v. Murphy, 25 Cal.2d 48, 153 P.2d 47 (1944) (decrease in expected value of lease due to World War II regulations).

a basic assumption on which the contract was made", it adds in comment b:

> "The continuation of existing market conditions and of the financial situation of the parties are ordinarily not such assumptions, so that mere market shifts or financial inability do not usually effect discharge under the rule stated in this Section."

Comment d adds:

> "A mere change in the degree of difficulty or expense due to such causes as increased wages, prices of raw materials, or costs of construction, unless well beyond the normal range, does not amount to impracticability since it is this sort of risk that a fixed-price contract is intended to cover."

*Cf.* § 285, comment a; Uniform Commercial Code § 2–615; 6 A. Corbin, Contracts § 1361 at 494 (1962); R. Posner, Economic Analysis of Law § 3.5 (1973).

■ The foregoing interpretive rule is, of course, not inflexible. We must, therefore, look to see if there is evidence in the record from which the district court could reasonably infer an "intention" or unstated "assumption" consistent with its ultimate conclusion. If there were evidence supporting such an inference, we would defer to the district court even if another inference seemed more persuasive. *See* United States v. Yellow Cab Co., 338 U.S. 338, 342, 70 S. Ct. 177, 94 L.Ed. 150 (1949); *cf.* Engine Specialties, Inc. v. Bombardier Ltd., 454 F.2d 527 (1st Cir. 1972). But we find none. Certainly there is no evidence that before or at the time the Agreement was made, the parties so much as considered the effect of unprofitability upon Vector's duty. The record is devoid of first-hand evidence concerning the subjective intentions of the signatories or of any relevant trade custom or usage.[6] To the extent we are to divine "intention" it must be from the language of the Agreement, the history of later dealings between the parties, and the general circumstances. From these, even accepting as true all the facts found by the district court and construing any disputed evidence most favorably to Vector, we are unable to interpret the Agreement as did the district court.

■ The Agreement itself does not mention "profitability". Clause 1 states that Vector is willing to buy provided that necessary governmental approvals are obtained. As the terms of a contract should be interpreted as a whole, and not out of the context of all the other terms, 3 A. Corbin, Contracts § 549 (1960), it seems most reasonable to read Clause 5(a), in connection with Clause 1, as limited to protecting Vector not against unprofitability but merely against the contingency that the governmental agencies might later refuse to buy the project. Vector had no use for the land or plaintiffs' planning activities except to complete the turnkey transaction. Had URHC later rejected the proposed substitution of Vector as developer of the project, had it backed down for any other reason or perhaps had the project or its terms been materially altered without Vector's approval,[7] Clause 5(a) would have protected Vector.

6. Mr. Fortunato, Vector's employee, testified that in "all instances it was always understood that you would only purchase the project if you could make it fly . . . ." But since he was not involved until well after the Agreement had been executed, his testimony does not tell us what was actually understood. He also testified that several times when Vector was the sole developer of other turnkey projects it had withdrawn because of economic unfeasibility. But practices when Vector was the sole developer, and thus had a free hand, are of little assistance in determining its contractual obligations to a third party.

7. Vector does not contend, and the court did not find, that the government's final offer materially varied, to Vector's disadvantage, from the previous one. The government's final offer was higher and more favorable than that under consideration at the time the Agreement was executed. The new offer and agreement to increase the number of units to be built had been negotiated in conjunction with Vector's agent and had been submitted to Vector, which had reiterated its intention to purchase. *See* note 4 *supra.* From testimony at trial, from the district court's finding of Vector's acquiescence, and from the let-

■ Ambiguities in a contract should be construed against the party who drafted it. 31 L.P.R.A. § 3478; Prieto v. Hull Dobbs Co., 88 P.R.R. 407 (1963). Application of this general principle of contract construction is strengthened by the fact that the interpretation advanced by Vector runs contrary to the usual allocation of risk in commercial contracts. While Vector did not have the detailed plans and costs in 1969, it is not uncommon for businessmen to assume the risk of unavoidable miscalculation. Had Vector wished to reserve a right to withdraw for unprofitability, it could easily have inserted a clause to that effect. Without that clause Vector was obligated to execute the URHC contract, if URHC offered one, at the best price it could get.

■ Plaintiffs expended considerable effort and some monies to bring the project to the point where URHC was willing to sign the final contract. Vector insisted that plaintiffs surrender another allegedly profitable opportunity to dispose of the project. It now proposes to move off, leaving plaintiffs to bear the expenses of the unprofitable venture. If the Agreement allows such a unilateral withdrawal, it would, in effect, either be an option or else so minimize the duty of performance of one of the parties as to be illusory. Absent compelling reason to the contrary, courts should construe contracts as lawful and valid. See 3 A. Corbin, Contracts § 546 (1960). We find no such compelling reason. The Agreement was drafted and executed with formality in a lawyer's office and was plainly thought to signify something.

On this record, bereft of direct evidence outside the contract relating to the intent of the parties, the contract clause itself, when we apply the relevant substantive and interpretive principles, does not seem capable of carrying the meaning assigned to it by the district court. Instead we think the findings of record compel a conclusion that Vector the court and the undisputed facts of violated the Agreement by declining to take steps to conclude a contract with URHC upon available terms, and thereafter to close with plaintiffs.

The remaining issue is the relief to which plaintiffs may be entitled. It is somewhat unclear why specific performance, as opposed to damages, would be in order in these circumstances, but we do not decide the point. We leave all questions pertaining to relief to the district court.

Reversed and remanded for further proceedings consistent herewith.

## ON PETITION FOR REHEARING

The petition for rehearing is denied. Although the case is close on its facts, we remain of opinion that our disposition was the correct one.

■ Vector argues that the court failed to recognize that the HUD Regulations "which had the force and effect of law" were incorporated into and were "the very reason and purpose of clause 5(a)". These, it is argued, provided in "clear and certain terms" the reasons for clause 5(a) and incorporated the mandatory trade custom or usage calling for a condition of "feasibility", including profit. We were aware, however, of this possible argument. In particular, we considered Mr. Fortunato's testimony outlining the steps in the manual and remarking (see footnote 6) that Vector had, on several occasions, withdrawn as the developer of a turnkey project, as, vis-a-vis the government, it had a perfect right to do. But Vector was in those situations acting as the sole developer. We do not think a developer's right, prior to contracting with the local authority, to withdraw from the project is a "trade cus-

---

ter itself, it is clear that as late as January, 1971, Vector was satisfied with the terms offered by URHC. Dissatisfaction occurred after Vector circulated the plans and specifi-

cations among local contractors and became convinced that given the prevailing construction costs the venture was not advantageous.

tom" shedding much light on the meaning of this contract between two private parties both of whom are on the "developer" side of negotiations with URHC. The project could indeed be terminated, but it remains necessary to determine what obligations the private parties had, in such event, created by their prior voluntary agreement. The regulations govern relations between a developer and the governmental authorities. They do not refer to situations of the sort here in dispute (viz. between developers), and we are unable to agree with Vector that this contract (which it drafted) provides in "clear and certain terms", or anything approaching them, that Vector was to have the same rights as to plaintiffs that a developer would have with the local authority. Nothing in the regulations prevents private parties from allocating the risks among themselves as they see fit. The thrust of Vector's position seems to be that, notwithstanding its execution of what appears to be a contract of purchase and sale, it bound itself to do no more than look out for its own interest, retaining at all times the right but not the duty to appropriate the benefits of the turnkey deal. Such a one-sided interpretation, placing all the risk on plaintiffs is, if not utterly beyond belief, at least so unusual in the case of a bilateral contract that we think it unsupportable in the absence of evidence that such was actually intended.

Vector's argument that the concept of feasibility, incorporated in HUD regulations, includes recognition of a profit factor cuts against, as well as for, Vector. Vector would more likely assume the risk of unprofitability knowing that any arrangement with HUD would, at least in theory, allow for a developer's profit. In any event we are confronted with a contract drafted by and for a sophisticated company by its attorney; there was evidence that Vector was well aware of what conventional option agreements were, and this was plainly not that; and we have no evidence to go on

from those who negotiated the contract as to what might actually have been intended. We think Vector must bear the cost of ambiguity.

We are aware that the regulations refer expressly to the availability of the HUD commitment to enable the developer to secure usual commercial financing. However, the record does not establish that it was commercially impossible to secure bank financing for the project on the terms available. *Cf.* Restatement, § 231, illustration 4. A question relating to the availability of financing was asked of only one witness who answered that he could not answer whether or not financing could have been obtained.

■ Vector's final argument, that the court erroneously "shifted the burden of persuasion to Vector", is not convincing. The burden was upon the plaintiffs to establish the existence of a contract and failure of performance. Plaintiffs made these allegations in their complaint and Vector admitted them in its answer. (See note 3.) Vector was then entitled to argue that its nonperformance was justified by the Agreement itself, given an interpretation of 5(a) favorable to Vector—but not too favorable to Vector lest the condition be deemed "performed" under Article 1068, 31 L.P.R.A. §§ 3043, 3373. (See opinion page 22.) Plaintiffs contested this reading of the provision and the issue was joined. After that joinder it is not helpful to speak of a "burden of persuasion" concerning the relevant law and guides to construction of a contract. In the absence of relevant evidence, the duty is upon the court to ascertain and apply the necessary legal rules, with the aid of both parties. Moreover, to the extent Vector is now arguing that, because the 5(a) condition on its face put performance solely within Vector's discretion, the plaintiffs were under a duty to introduce evidence of a contrary meaning, the argument is brought up short by the civil law. An absolutist or "plain words" reading of the 5(a) condition would have resulted in its being consid-

ered as "performed". In order to avert that consequence, the burden fell upon Vector, if it fell upon anyone, to show what content the condition "really" had. But whether the burden fell upon Vector, upon the plaintiffs, or upon no one, there must be some support for construing 5(a) to include an implied permission to decline to proceed because of unprofitability.