NATIONAL LABOR RELATIONS BOARD *v.* LOCAL
UNION NO. 103, INTERNATIONAL ASSOCIATION
OF BRIDGE, STRUCTURAL & ORNAMENTAL
IRON WORKERS, AFL–CIO, ET AL.

No. 76–719.   Argued October 31, 1977—Decided January 17, 1978

*Norton J. Come* argued the cause for petitioner. With him on the briefs were *Solicitor General McCree, Richard A. Allen, John S. Irving, Carl L. Taylor,* and *Linda Sher.*

*Sydney L. Berger* argued the cause for respondents. With him on the brief was *Charles L. Berger.**

---

*\*J. Albert Woll* and *Laurence Gold* filed a brief for the American Federation of Labor and Congress of Industrial Organizations as *amicus curiae.*

Mr. Justice White delivered the opinion of the Court.

Sections 8 (b)(7) and 8 (f) were added to the National Labor Relations Act in 1959.[1] Section 8 (f), permitting so-

---

[1] Section 8 (b)(7), 73 Stat. 544, 29 U. S. C. § 158 (b)(7), provides:

"It shall be an unfair labor practice for a labor organization or its agents . . . to picket or cause to be picketed, or threaten to picket or cause to be picketed, any employer where an object thereof is forcing or requiring an employer to recognize or bargain with a labor organization as the representative of his employees, or forcing or requiring the employees of an employer to accept or select such labor organization as their collective bargaining representative, unless such labor organization is currently certified as the representative of such employees:

"(A) where the employer has lawfully recognized in accordance with this Act any other labor organization and a question concerning representation may not appropriately be raised under section 9(c) of this Act,

"(B) where within the preceding twelve months a valid election under section 9(c) of this Act has been conducted, or

"(C) where such picketing has been conducted without a petition under section 9(c) being filed within a reasonable period of time not to exceed thirty days from the commencement of such picketing: *Provided,* That when such a petition has been filed the Board shall forthwith, without regard to the provisions of section 9 (c)(1) or the absence of a showing of a substantial interest on the part of the labor organization, direct an election in such unit as the Board finds to be appropriate and shall certify the results thereof: *Provided further,* That nothing in this subparagraph (C) shall be construed to prohibit any picketing or other publicity for the purpose of truthfully advising the public (including consumers) that an employer does not employ members of, or have a contract with, a labor organization, unless an effect of such picketing is to induce any individual employed by any other person in the course of his employment, not to pick up, deliver or transport any goods or not to perform any services.

"Nothing in this paragraph (7) shall be construed to permit any act which would otherwise be an unfair labor practice under this section 8 (b)."

Section 8 (f), 73 Stat. 545, 29 U. S. C. § 158 (f), provides:

"It shall not be an unfair labor practice under subsections (a) and (b) of this section for an employer engaged primarily in the building and construction industry to make an agreement covering employees engaged (or who, upon their employment, will be engaged) in the building and construction industry with a labor organization of which building and construction employees are members (not established, maintained, or assisted

called "prehire" agreements in the construction industry, provides that it shall not be an unfair labor practice to enter into such an agreement with a union that has not attained majority status prior to the execution of the agreement. Under § 8 (b) (7)(C), a union that is not the certified representative of the employees in the relevant unit commits an unfair labor practice if it pickets an employer with "an object" of "forcing or requiring an employer to recognize or bargain with a labor organization as the representative of his employees" and if it does not within 30 days file a petition for an election under § 9 (c). The National Labor Relations Board (Board) held that it is an unfair labor practice within the meaning of § 8 (b)(7)(C) for an uncertified union not representing a majority of the employees to engage in extended picketing in an effort to enforce a prehire agreement with the employer.[2] The issue here is whether this is a misapplication of the section, as the Court of Appeals held in this case.[3]

---

by any action defined in section 8 (a) of this Act as an unfair labor practice) because (1) the majority status of such labor organization has not been established under the provisions of section 9 of this Act prior to the making of such agreements, or (2) such agreement requires as a condition of employment, membership in such labor organization after the seventh day following the beginning of such employment or the effective date of the agreement, whichever is later, or (3) such agreement requires the employer to notify such labor organization of opportunities for employment with such employer, or gives such labor organization an opportunity to refer qualified applicants for such employment, or (4) such agreement specifies minimum training or experience qualifications for employment or provides for priority in opportunities for employment based upon length of service with such employer, in the industry or in the particular geographical area: *Provided,* That nothing in this subsection shall set aside the final proviso to section 8 (a)(3) of this Act: *Provided further,* That any agreement which would be invalid, but for clause (1) of this subsection, shall not be a bar to a petition filed pursuant to section 9 (c) or 9 (e)."

[2] *Iron Workers Local 103 (Higdon Contracting Co.),* 216 N. L. R. B. 45 (1975).

[3] *Iron Workers Local 103* v. *NLRB,* 175 U. S. App. D. C. 259, 535 F. 2d 87 (1976).

## I

Higdon Construction Co. and Local 103 of the International Association of Bridge, Structural & Ornamental Iron Workers, AFL–CIO (hereinafter Local 103), had a history of collective bargaining dating back to 1968. A prehire agreement was reached by Local 103 and Higdon on July 31, 1973, obliging Higdon to abide by the terms of the multiemployer understanding between Local 103 and the Tri-State Iron Workers Employers Association, Inc. No union security clause provision was contained in the Local 103-Higdon agreement. At about the same time, Higdon Contracting Co. was formed for the express purpose of carrying on construction work with nonunion labor. Local 103 picketed two projects subsequently undertaken by Higdon Contracting Co., in Kentucky and Indiana, with signs which read: "Higdon Construction Company is in violation of the agreement of the Iron Workers Local Number 103." Picketing at one jobsite persisted for more than 30 days, into March 1974. Local 103 had never represented a majority of the employees at either site and, although it was free to do so, it did not petition for a representation election to determine the wishes of the employees at either location.

On March 6, 1974, Higdon Contracting Co. filed a charge with the Regional Director of the Board, alleging that Local 103 was violating § 8 (b)(7) of the Labor Act. The Administrative Law Judge found that Higdon Contracting Co. and Higdon Construction Co. were legally indistinct for purposes of the proceedings. In an opinion issued August 23, 1974, he concluded that Local 103's picketing did not constitute an unfair labor practice. Higdon had entered into a lawful § 8 (f) prehire contract with Local 103 by which it promised to abide by the multiemployer standard. The picketing was for purposes of obtaining compliance with an existing contract, rather than to obtain recognition or bargaining as an initial matter. Only the latter was a purpose forbidden by § 8 (b)(7).

The Board did not agree with the Administrative Law Judge. Relying on its *R. J. Smith* decision,[4] the Board emphasized the fact that Local 103 had never achieved majority status, and the § 8 (f) agreement thus had no binding force on the employer. For this reason, Local 103's picketing was not simply for the purpose of forcing compliance with an existing contract, even though the Board accepted the finding that only a single employer was involved. Under the Board's view of the law and the evidence, an object of the picketing was "forcing and requiring Higdon Contracting Company, Inc., to bargain with [Local 103], without being currently certified as the representative of Higdon Contracting Company, Inc.'s employees and without a petition under Section 9 (c) being filed within a reasonable period of time . . . ."

Local 103 sought review in the United States Court of Appeals for the District of Columbia Circuit. That court set aside the order, as it had set aside the Board's *R. J. Smith* order three years previously.[5] The Court of Appeals ruled that the validity of a § 8 (f) prehire contract carried with it the right to enforce that contract by picketing, and the right as well, when breach of the agreement occurs, to file and prevail on an unfair labor practice charge against the employer for failure to bargain. This elevation of a nonmajority union to the rights of majority status was acceptable, in the court's view, because of the second proviso to § 8 (f), which denies the usual contract bar protection to prehire agreements and permits a representation election to be held at the instance of either party at any time during the life of the agreement.

The Board's subsequent petition to this Court for a writ of certiorari was granted.[6] We reverse.

---

[4] *R. J. Smith Construction Co.*, 191 N. L. R. B. 693 (1971), enf. denied *sub nom. Engineers Local 150* v. *NLRB*, 156 U. S. App. D. C. 294, 480 F. 2d 1186 (1973).

[5] *Engineers Local 150* v. *NLRB, supra.*

[6] 429 U. S. 1089 (1977).

## II

It is undisputed that the union was not the certified representative of Higdon's employees and that it did not file an election petition within 30 days of the onset of the picketing. The issue for the Board was whether for the purposes of § 8 (b)(7)(C), the union pickets carrying signs asserting that Higdon was violating an agreement with the union were picketing with the forbidden purpose of requiring Higdon to recognize or bargain with the union. Under the Board's view of § 8 (f), a prehire agreement does not entitle a minority union to be treated as the majority representative of the employees until and unless it attains majority support in the relevant unit. Until that time the prehire agreement is voidable and does not have the same stature as a collective-bargaining contract entered into with a union actually representing a majority of the employees and recognized as such by the employer. Accordingly, the Board holds, as it did here, that picketing by a minority union to enforce a prehire agreement that the employer refuses to honor, effectively has the object of attaining recognition as the bargaining representative with majority support among the employees, and is consequently violative of § 8 (b)(7)(C). The Board and the Court of Appeals thus differ principally on the legal questions of how § 8 (f) is to be construed and of what consequences the execution of a prehire agreement has on the enforcement of other sections of the Act, primarily §§ 8 (a)(5) and 8 (b)(7) (C). We have concluded that the Board's construction of the Act, although perhaps not the only tenable one, is an acceptable reading of the statutory language and a reasonable implementation of the purposes of the relevant statutory sections.[7]

---

[7] As will appear, the Board's conclusion that an object of the picketing was to obtain recognition even though Local 103 sought only to enforce the § 8 (f) contract, flows from the Board's view that a prehire contract is not the equivalent of recognizing the union as the majority representa-

Although on its face, § 8 (b)(7)(C) would apply to any extended picketing by an uncertified union where recognition or bargaining is an object, the section has not been literally

---

tive of the employees, and that an attempt to enforce the prehire agreement by picketing to require the employer to treat with the union is recognitional picketing.

Determining the object, or objects, of labor union picketing is a recurring and necessary function of the Board. Its resolution of these mixed factual and legal questions normally survives judicial review. A type of activity frequently found to violate § 8 (b)(7) is picketing ostensibly for the purpose of forcing an employer to abide by terms incorporated into agreements between the union and other employers. Even in cases where the union expressly disavows any recognitional intent, acceptance of the uniform terms proposed by the union can have the "net effect" of establishing the union "as the negotiator of wage rates and benefits." *Centralia Building & Construction Trades Council* v. *NLRB*, 124 U. S. App. D. C. 212, 214, 363 F. 2d 699, 701 (1966). "The Board has held that informing the public that an employer does not employ members of a labor organization indicates an organizational object, and that stating that an employer does not have a contract with a labor organization similarly implies an object of recognition and bargaining." *Carpenters Local 906*, 204 N. L. R. B. 138, 139 (1973). Hence, picketing to enforce area standards, where an employer had been assured by notice from the union that "while we expect you to observe the wages, hours, and other benefits set forth in these documents, we do not expect or seek any collective bargaining relationship with your firm," has been held to violate § 8 (b)(7). *Hotel & Restaurant Employees (Holiday Inns of America, Inc.)*, 169 N. L. R. B. 683, 684 (1968).

The Courts of Appeals have upheld the Board in these inferences. "Though this legend ['Non-Union Conditions'] could be interpreted as merely a protest of the restaurant's working conditions, it was reasonable for the NLRB to conclude that the message . . . was at least in part that the union desired to alter a non-union working situation by obtaining recognition. In the absence of any countervailing evidence, the NLRB could thus determine that the purpose of the picketing was recognitional." *San Francisco Local Joint Board* v. *NLRB*, 163 U. S. App. D. C. 234, 239, 501 F. 2d 794, 799 (1974). See also *NLRB* v. *Carpenters*, 450 F. 2d 1255 (CA9 1971), and cases cited therein.

In the present case, the Local's business agent contacted Higdon Contracting's general manager, asking "if 'we' were going to use union people

applied. The Board holds that an employer's refusal to honor a collective-bargaining contract executed with the union having majority support is a refusal to bargain and an unfair labor practice under § 8 (a) (5).[8] Extended picketing by the union attempting to enforce the contract thus seeks to require bargaining, but as the Board applies the Act, § 8 (b) (7) (C) does not bar such picketing. *Building & Construction Trades Council of Santa Barbara County (Sullivan Electric Co.),* 146 N. L. R. B. 1086 (1964); *Bay Counties District Council of Carpenters (Disney Roofing & Material Co.),* 154 N. L. R. B. 1598, 1605 (1965). The prohibition of § 8 (b) (7) (C) against picketing with an object of forcing an employer "to recognize or bargain with a labor organization" should not be read as encompassing two separate and unrelated terms, but was "intended to proscribe picketing having as its target forcing or requiring an employer's initial acceptance of the union as the bargaining representative of his employees." *Sullivan Electric, supra,* at 1087.

As the present case demonstrates, however, the *Sullivan Electric* rule does not protect picketing to enforce a contract

---

on the job." The general manager answered in the negative; the business agent replied, "I'll get right on it," and the pickets materialized. The message on the picket signs announced that Higdon was not in compliance with the terms of its agreement with Local 103. The inference is certainly sustainable that Local 103 wished Higdon to abide by those terms.

Hence, if the Board is correct in its view of the interaction of §§ 8 (f) and 8 (b) (7) (C), the Board's decision here was within settled precedent in concluding that a purpose of the picketing was to force Higdon Contracting to recognize or bargain with the union. The picketing carried on in this case, unless § 8 (f) required a contrary conclusion as a matter of law, was in clear violation of § 8 (b) (7) (C).

[8] See *NLRB* v. *Hyde,* 339 F. 2d 568, 571–573 (CA9 1965). A contract with a majority representative also carries with it the presumption that the union's majority status still obtains. *Dayton Motels, Inc.,* 192 N. L. R. B. 674, 678 (1971), remanded, 474 F. 2d 328 (CA6 1973), enf'd, 525 F. 2d 476 (CA6 1976).

entered into pursuant to § 8 (f) where the union is not and has never been the chosen representative of a majority of the employees in a relevant unit. Neither will the Board issue a § 8 (a)(5) bargaining order against an employee refusing to abide by a § 8 (f) contract unless the complaining union can demonstrate its majority status in the unit. *R. J. Smith Construction Co.,* 191 N. L. R. B. 693 (1971).

The Board's position is rooted in the generally prevailing statutory policy that a union should not purport to act as the collective-bargaining agent for all unit employees, and may not be recognized as such, unless it is the voice of the majority of the employees in the unit. Section 7 of the Act, 61 Stat. 140, 29 U. S. C. § 157, guarantees the employees the right to bargain collectively with representatives of their own choosing. Section 9 (a), 29 U. S. C. § 159 (a), provides that the bargaining agent for all of the employees in the appropriate unit must be the representative "designated or selected for the purposes of collective bargaining by the majority of the employees . . . ."

It is thus an unfair practice for an employer under §§ 8 (a) (1) and (2) and for a union under § 8 (b)(1)(A) to interfere with, restrain, or coerce employees in the exercise of their right to select their representative. The Court has held that both union and employer commit unfair practices when they sign a collective-bargaining agreement recognizing the union as the exclusive bargaining representative when in fact only a minority of the employees have authorized the union to represent their interests. "There could be no clearer abridgment of § 7 of the Act, assuring employees the right 'to bargain collectively through representatives of their own choosing' or 'to refrain from' such activity" than to grant "exclusive bargaining status to an agency selected by a minority of its employees, thereby impressing that agent upon the nonconsenting majority." *Garment Workers* v. *NLRB,* 366 U. S. 731, 737 (1961). This is true even though the employer and the union believe in good faith, but mistakenly, that the union

has obtained majority support. "To countenance such an excuse would place in permissibly careless employer and union hands the power to completely frustrate employee realization of the premise of the Act—that its prohibitions will go far to assure freedom of choice and majority rule in employee selection of representatives." *Id.*, at 738–739.

Section 8 (f) is an exception to this rule. The execution of an agreement with a minority union, an act normally an unfair practice by both employer and union, is legitimated by § 8 (f) when the employer is in the construction industry. The exception is nevertheless of limited scope, for the usual rule protecting the union from inquiry into its majority status during the terms of a collective-bargaining contract does not apply to prehire agreements. A proviso to the section declares that a § 8 (f) contract, which would be invalid absent the section, "shall not be a bar to a petition filed pursuant to section 9 (c) or 9 (e)." The employer and its employees—and the union itself for that matter—may call for a bargaining representative election at any time.

The proviso exposing unions with prehire agreements to inquiry into their majority standing by elections under § 9 (c) led the Board to its decision in *R. J. Smith:* An employer does not commit an unfair practice under § 8 (a)(5) when he refuses to honor the contract and bargain with the union and the union fails to establish in the unfair labor practice proceeding that it has ever had majority support. As viewed by the Board, a "prehire agreement is merely a preliminary step that contemplates further action for the development of a full bargaining relationship." *Ruttmann Construction Co.,* 191 N. L. R. B. 701, 702 (1971). The employer's duty to bargain and honor the contract is contingent on the union's attaining majority support at the various construction sites. In *NLRB v. Irvin,* 475 F. 2d 1265 (CA3 1973), for example, the prehire contract was deemed binding on those projects at which the union had secured a majority but not with respect to those

projects not yet begun before the union had terminated the contract.

Applying this view of § 8 (f) in the § 8 (b)(7)(C) context, the Board held in this case that when the union picketed to enforce its prehire agreement, Higdon could challenge the union's majority standing by filing a § 8 (b)(7) charge and could prevail, as Higdon did here, because the union admittedly lacked majority credentials at the picketed projects. Absent these qualifications, the collective-bargaining relationship and the union's entitlement to act as the exclusive bargaining agent had never matured. Picketing to enforce the § 8 (f) contract was the legal equivalent of picketing to require recognition as the exclusive agent, and § 8 (b)(7)(C) was infringed when the union failed to request an election within 30 days.

Nothing in the language or purposes of either § 8 (f) or § 8 (b)(7) forecloses this application of the statute. Because of § 8 (f), the making of prehire agreements with minority unions is not an unfair practice as it would be in other industries. But § 8 (f) itself does not purport to authorize picketing to enforce prehire agreements where the union has not achieved majority support. Neither does it expand the duty of an employer under § 8 (a)(5), which is to bargain with a *majority* representative, to require the employer to bargain with a union with which he has executed a prehire agreement but which has failed to win majority support in the covered unit.

As for § 8 (b)(7), which, along with § 8 (f), was added in 1959, its major purpose was to implement one of the Act's principal goals—to ensure that employees were free to make an uncoerced choice of bargaining agent. As we recognized in *Connell Construction Co.* v. *Plumbers & Steamfitters*, 421 U. S. 616 (1975), "[o]ne of the major aims of the 1959 Act was to limit 'top down' organizing campaigns, in which unions used economic weapons to force recognition from an employer

regardless of the wishes of his employees." *Id.*, at 632, and references cited therein. The use of picketing was of particular concern as a method of coercion in three specific contexts: where employees had already selected another union representative, where employees had recently voted against a labor union, and where employees had not been given a chance to vote on the question of representation. Picketing in these circumstances was thought impermissibly to interfere with the employees' freedom of choice.[9]

Congressional concern about coerced designations of bargaining agents did not evaporate as the focus turned to the

---

[9] "The total effect of these proposals in the administration bill would be to regulate picketing so that employers and their employees will not be subject to the continuous coercion of an organizational picket line." 105 Cong. Rec. 1731 (1959) (remarks of Sen. Dirksen), 2 NLRB, Legislative History of the Labor-Management Reporting and Disclosure Act of 1959, p. 994 (hereinafter cited as Leg. Hist.).

The administration bill had added the provisions that would become § 8 (b) (7). The Department of Labor's explanatory statement grouped together the ways in which unfair picketing pressure could be exerted, and noted that the bill would make it "an unfair labor practice, subject to mandatory injunction, for a union to picket in order to coerce an employer to recognize it as bargaining representative of his employees . . . ." 105 Cong. Rec. 1281 (1959), 2 Leg. Hist. 977.

The President's transmittal letter had stated:

"I recommend legislation . . . [t]o make it illegal for a union, by picketing, to coerce an employer to recognize it as the bargaining representative of his employees or his employees to accept or designate it as their representative where the employer has recognized in accordance with law another labor organization, or where a representation election has been conducted within the last preceding 12 months, or where it cannot be demonstrated that there is a sufficient showing of interest on the part of the employees in being represented by the picketing union *or where the picketing has continued for a reasonable period of time without the desires of the employees being determined by a representation election; and to provide speedy and effective enforcement measures.*" S. Doc. No. 10, 86th Cong., 1st Sess., 2–3 (1959), 1 Leg. Hist. 81–82 (emphasis added).

construction industry.[10] Section 8 (f) was, of course, motivated by an awareness of the unique situation in that industry. Because the Board had not asserted jurisdiction over the construction industry before 1947, the House Committee Report observed that concepts evoked by the Board had been "developed without reference to the construction industry." H. R. Rep. No. 741, 86th Cong., 1st Sess., 19 (1959), 1 Leg. Hist. 777. There were two aspects peculiar to the building trades that Congress apparently thought justified the use of prehire agreements with unions that did not then represent a majority of the employees:

> "One reason for this practice is that it is necessary for the employer to know his labor costs before making the estimate upon which his bid will be based. A second reason is that the employer must be able to have available a supply of skilled craftsmen ready for quick referral." *Ibid.*

---

[10] Congress was careful to make its intention clear that prehire agreements were to be arrived at voluntarily, and no element of coercion was to be admitted into the narrow exception being established to the majority principle. Representative Barden, an important House floor leader on the bill and a conferee, introduced as an expression of legislative intent Senator Kennedy's explanation the year before of the voluntary nature of the prehire provision:

"Mr. Kennedy: I shall answer the Senator from Florida as follows—and it is my intention, by so answering, to establish the legislative history on this question: It was not the intention of the committee to require by section 604 (a) the making of prehire agreements, but, rather, to permit them; nor was it the intention of the committee to authorize a labor organization to strike, picket, or otherwise coerce an employer to sign a prehire agreement where the majority status of the union had not been established. The purpose of this section is to permit voluntary prehire agreements." 105 Cong. Rec. 18128 (1959), 2 Leg. Hist. 1715.

The House Conference Report similarly stressed that "[n]othing in such provision is intended . . . to authorize the use of force, coercion, strikes, or picketing to compel any person to enter into such prehire agreements." H. R. Rep. No. 1147, 86th Cong., 1st Sess., 42 (1959), 1 Leg. Hist. 946.

The Senate Report also noted that "[r]epresentation elections in a large segment of the industry are not feasible to demonstrate . . . majority status due to the short periods of actual employment by specific employers." S. Rep. No. 187, 86th Cong., 1st Sess., 55 (1959), 1 Leg. Hist. 541–542. Privileging unions and employers to execute and observe prehire agreements in an effort to accommodate the special circumstances in the construction industry may have greatly convenienced unions and employers, but in no sense can it be portrayed as an expression of the employees' organizational wishes. Hence the proviso that an election could be demanded despite the prehire agreement. By the same token, because § 8 (b)(7) was adopted to ensure voluntary, uncoerced selection of a bargaining representative by employees, we cannot fault the Board for holding that § 8 (b)(7) applies to a minority union picketing to enforce a prehire contract.

The Board's position does not, as respondents claim, render § 8 (f) meaningless.[11] Except for § 8 (f), neither the employer nor the union could execute prehire agreements without committing unfair labor practices. Neither has the Board challenged the voluntary observance of otherwise valid § 8 (f) contracts, which is the normal course of events. It is also

---

[11] A comparable situation obtains concerning hot-cargo clauses, which are permitted in the construction industry by § 8 (e), 29 U. S. C. § 158 (e), but which cannot be enforced by picketing. Before the enactment of the proviso, this Court held that it was a violation of the secondary boycott provisions of the Act, § 8 (b)(4)(A), 61 Stat. 136, to enforce a lawful hot-cargo clause in a contract by refusing to work. *Carpenters* v. *NLRB*, 357 U. S. 93 (1958). After the adoption of § 8 (e), it has remained the Board's position that a hot-cargo clause in the construction industry, which is exempted from the ban of § 8 (e), may not be enforced by conduct forbidden by § 8 (b)(4). *Northeastern Indiana Building & Construction Trades Council*, 148 N. L. R. B. 854 (1964), remanded on other grounds, 122 U. S. App. D. C. 220, 352 F. 2d 696 (1965). Cf. *NLRB* v. *Pipefitters*, 429 U. S. 507 (1977) (valid work preservation agreement does not privilege secondary boycott picketing).

undisputed that when the union successfully ·seeks majority support, the prehire agreement attains the status of a collective-bargaining agreement executed by the employer with a union representing a majority of the employees in the unit.

The Board's resolution of the conflicting claims in this case represents a defensible construction of the statute and is entitled to considerable deference. Courts may prefer a different application of the relevant sections, but "[t]he function of striking that balance to effectuate national labor policy is often a difficult and delicate responsibility, which the Congress committed primarily to the National Labor Relations Board, subject to limited judicial review." *NLRB* v. *Truck Drivers,* 353 U. S. 87, 96 (1957); *NLRB* v. *Insurance Agents,* 361 U. S. 477, 499 (1960). Of course, "recognition of the appropriate sphere of the administrative power . . . obviously cannot exclude all judicial review of the Board's actions." *Ibid.* But we cannot say that the Board has here "[moved] into a new area of regulation which Congress [has] not committed to it." *Ibid.* In *American Ship Building Co.* v. *NLRB,* 380 U. S. 300, 318 (1965), the Court was "unable to find that any fair construction of the provisions relied on by the Board . . . can support its finding of an unfair labor practice . . . . [T]he role assumed by the Board . . . ·[was] fundamentally inconsistent with the structure of the Act and the function of the sections relied upon." As we have explained, this is not the case here.

The union suggests that the Board's construction of § 8 (f) deserves little or no deference because it is merely an application in the § 8 (b)(7) context of the decision in *R. J. Smith Construction Co.,* 191 N. L. R. B. 693 (1971), which itself was inconsistent with a prior decision, *Oilfield Maintenance Co.,* 142 N. L. R. B. 1384 (1963). It is not at all clear from the latter .case, however, that the union involved there had never had majority status. The issue received only passing attention at the time; and the case was distinguished by the Board

in *Ruttmann Construction Co.*, 191 N. L. R. B., at 701 n. 5, decided the same day as *R. J. Smith, supra,* as being "primarily concerned" with "the right of a successor-employer to disavow contracts made by a predecessor with five different unions and substitute the terms of a contract it had with another union." In any event, if *Oilfield Maintenance* represents a view that the majority status of the union executing a prehire agreement may not be challenged in unfair labor practice proceedings, the Board has plainly not adhered to that approach. Its contrary view has been expressed on more than one occasion.[12] An administrative agency is not disqualified from changing its mind; and when it does, the courts still sit in review of the administrative decision and should not approach the statutory construction issue *de novo* and without regard to the administrative understanding of the statutes.

The union argues that the Board's position permitting an employer to repudiate a prehire agreement until the union attains majority support renders the contract for all practical purposes unenforceable, assertedly contrary to this Court's decision in *Retail Clerks* v. *Lion Dry Goods, Inc.,* 369 U. S. 17 (1962). There, the Court's opinion recognized that § 301 of the Labor Management Relations Act confers jurisdiction on the federal courts to entertain suits on contracts between an employer and a minority union, as well as those with majority-designated collective-bargaining agents. Section 8 (f) contracts were noted as being in this category. The Court was nevertheless speaking to an issue of jurisdiction. That a court has jurisdiction to consider a suit on a particular contract does not suggest that the contract is enforceable. It would not be inconsistent with *Lion Dry Goods* for a court to hold that the

---

[12] In *R. J. Smith,* the Board expressly limited any such implication from *Oilfield Maintenance* to cases where a rebuttable presumption of majority status, or majority status in fact, existed. One-time majority status, coupled with a union security clause that has been enforced, gives rise to a rebuttable presumption of continued majority status, in the Board's view. See *R. J. Smith,* 191 N. L. R. B., at 695.

union's majority standing is subject to litigation in a § 301 suit to enforce a § 8 (f) contract, just as it is in a § 8 (a)(5) unfair labor practice proceeding, and that absent a showing that the union is the majority's chosen instrument, the contract is unenforceable.

It is also clear from what has already been said, that the decision here is not inconsistent with *Building & Construction Trades Council of Santa Barbara County (Sullivan Electric Co.)*, 146 N. L. R. B. 1086 (1964). That case merely permits picketing to enforce contracts with a union actually representing a majority of the employees in the unit. Here, the union did not represent the majority, and in picketing to enforce the prehire agreement, it sought the privileges of a majority representative. The conclusion that § 8 (b)(7) was violated is legally defensible and factually acceptable.

The judgment of the Court of Appeals is reversed.

*So ordered.*

Mr. Justice Stewart, with whom Mr. Justice Blackmun and Mr. Justice Stevens join, dissenting.

An employer in the construction industry, like any other employer, is under no obligation to bargain with a labor organization that does not represent a majority of his employees.[1] See *NLRB* v. *Philamon Laboratories, Inc.*, 298 F. 2d 176, 179 (CA2). But unlike other employers, he is free to do so, and may under § 8 (f) sign a contract with a union whose majority status has not been established without risking liability under

---

[1] Section 8 (a)(5) of the National Labor Relations Act, as set forth in 29 U. S. C. § 158 (a)(5), provides that it is an unfair labor practice for an employer "to refuse to bargain collectively with the representatives of his employees, subject to the provisions of section 159 (a) of this title." Section 9 (a), 29 U. S. C. § 159 (a), provides in pertinent part that "[r]epresentatives designated or selected for the purposes of collective bargaining by the majority of the employees in a unit appropriate for such purposes, shall be the exclusive representatives of all the employees in such unit for the purposes of collective bargaining . . . ."

§ 8 (a) (1) for interfering with the organizational rights of employees by recognizing a minority union.[2] Cf. *Garment Workers* v. *NLRB*, 366 U. S. 731. When an employer in the construction industry does choose to enter a § 8 (f) prehire agreement, there is nothing in the provisions or policies of national labor law that allows the employer, or the Board, to dismiss the agreement as a nullity. Yet in this case the Court holds that both the Board and the employer may do precisely that.

Whether or not it has the "same stature as a collective-bargaining contract" with a majority union, *ante,* at 341, or may be the subject of a § 8 (a) (5) bargaining order, *R. J. Smith Construction Co.,* 191 N. L. R. B. 693, enf. denied *sub nom. Engineers Local 150* v. *NLRB,* 156 U. S. App. D. C. 294, 480 F. 2d 1186, a § 8 (f) prehire agreement is a contract embodying correlative obligations between two parties. The Board in this case concedes that the employer could lawfully have chosen to adhere to the agreement even though the union had not attained majority status. Thus even if Higdon was under no legal duty to abide by the terms of the prehire agreement, that fact does not establish that Higdon was immune from economic pressure aimed at encouraging it to do so.

Peaceful primary picketing in pursuit of lawful objectives, even by a minority union, is not forbidden by the National Labor Relations Act unless it falls within an express statutory prohibition. *NLRB* v. *Teamsters,* 362 U. S. 274, 282. The

---

[2] Section 8 (f) of the National Labor Relations Act, as set forth in 29 U. S. C. § 158 (f), provides in pertinent part:

"It shall not be an unfair labor practice under subsections (a) and (b) of this section for an employer engaged primarily in the building and construction industry to make an agreement covering employees engaged (or who, upon their employment, will be engaged) in the building and construction industry with a labor organization of which building and construction employees are members . . . because (1) the majority status of such labor organization has not been established under the provisions of section 159 of this title prior to the making of such agreement . . . ."

only such statutory provision that the Board believes to be applicable to this case is § 8 (b)(7), which prohibits most organizational and recognitional picketing.[3] But the Board's contention that § 8 (b)(7) prohibits picketing to compel compliance with an existing prehire agreement is not supported by the language of that section or by the Board's prior interpretations of it.

Section 8 (b)(7) prohibits "picketing to force an employer 'to *recognize* or *bargain with* a labor organization as the representative of his employees.'" *Building & Construction Trades Council of Santa Barbara County (Sullivan Electric Co.)*, 146 N. L. R. B. 1086, 1087 (quoting statute, emphasis in Board's opinion). As interpreted by the Board, this section does not prohibit picketing to enforce an existing collective-bargaining contract, even though enforcement would require actual bargaining, since it was intended to proscribe only "picketing having as its target forcing or requiring an employer's *initial acceptance* of the union as the bargaining representative of his employees." *Ibid.* (Emphasis supplied.)

However one may view the relationship established by a § 8 (f) agreement, it is established when the agreement is signed. Only by the most strained interpretation of the terms can picketing to enforce the agreement be said to be for the

---

[3] Section 8 (b)(7) of the National Labor Relations Act, as set forth in 29 U. S. C. § 158 (b)(7), provides in pertinent part that it shall be an unfair labor practice for a labor organization

"to picket or cause to be picketed, or threaten to picket or cause to be picketed, any employer where an object thereof is forcing or requiring an employer to recognize or bargain with a labor organization as the representative of his employees, or forcing or requiring the employees of an employer to accept or select such labor organization as their collective bargaining representative, unless such labor organization is currently certified as the representative of such employees:

. . . . .

"(C) where such picketing has been conducted without a petition under section 159 (c) of this title being filed within a reasonable period of time not to exceed thirty days from the commencement of such picketing . . . ."

purpose of gaining "initial acceptance" or recognition.[4] And such a tortured construction would be patently inconsistent with § 13 of the Act, 29 U. S. C. § 163, which "is a command of Congress to the courts to resolve doubts and ambiguities in favor of an interpretation . . . which safeguards the right to strike as understood prior to the passage of the Taft-Hartley Act." *NLRB* v. *Teamsters, supra,* at 282.

Since I think neither § 8 (b)(7) nor any other provision of the Act rendered illegal the union's peaceful primary picket protesting Higdon's unilateral and total breach of its prehire agreement, I would affirm the judgment of the Court of Appeals.

---

[4] The Board and the Court rely on cases holding that "picketing ostensibly for the purpose of forcing an employer to abide by terms incorporated into agreements between the union and other employers" may in fact have a recognitional purpose in violation of § 8 (b)(7). *Ante,* at 342 n. 7. See, *e. g., Carpenters Local 906,* 204 N. L. R. B. 138; *Hotel & Restaurant Employees (Holiday Inns of America, Inc.),* 169 N. L. R. B. 683. But in none of these cases did the union and the employer have a pre-existing relationship under a § 8 (f) agreement.