BATON ROUGE BUILDING AND CONSTRUCTION TRADES COUNCIL, AFL–CIO; International Union of Operating Engineers, Local 406; Construction and General Laborers Local 1177; United Brotherhood of Carpenters and Joiners of America, Local 1098

v.

E. C. SCHAFER CONSTRUCTION COMPANY, INC.

Civ. A. No. 77–475–A.

United States District Court, M. D. Louisiana.

Jan. 24, 1980.

Supplemental Opinion April 11, 1980.

Louis L. Robein, Jr., Dodd, Barker, Boudreaux, Lamy & Gardner, New Orleans, La., for plaintiffs.

C. W. Phillips, William Norfolk, G. Michael Pharis, Taylor, Porter, Brooks & Phillips, Baton Rouge, La., for defendant.

E. GORDON WEST, District Judge:

This action was brought by the Baton Rouge Building and Construction Trades Council, AFL–CIO, and associated labor unions, to enforce certain pre-hire agreements entered into between them and the defendant, E. C. Schafer Construction Company, Inc.

Jurisdiction in this court is founded on federal questions arising from the application of the Labor-Management Relations

Act, 29 U.S.C.A. 185(a) and the Employee Retirement Income Security Act of 1974, 29 U.S.C.A. 1132 (ERISA).

*FACTS*

Briefly, the unions complain that the defendant contractor signed written agreements with them in 1974, which he unilaterally ceased to honor at a subsequent date. They pray for damages in the amount of back wages and pension benefits payable under the agreements, and attorney's fees.

Prior to Fall 1974, Schafer had been primarily a residential and apartment construction contractor and had been non-union. In the Fall of that year, the Schafer Company was incorporated and began to solicit commercial construction jobs. The first such job awarded to the new concern involved the construction of an Administration Building and Gatehouse at the Port Hudson plant of Georgia-Pacific. The job was bid non-union.

Shortly after commencement of work at Georgia-Pacific, a picket line appeared, which provoked meetings between Schafer and the unions, leading to the confection of the agreements which form the subject of this litigation.

*WHAT WAS THE INTENDED SCOPE AND DURATION OF THE AGREEMENTS?*

■ Plaintiffs and defendant hotly contest the meaning of the portion of their written agreement which reads as follows, "This agreement will exclude the Administration Building and Guard House at Georgia-Pacific, Port Hudson, but will cover all other work obtained between the period of August 26, 1974 and October 26, 1974."

According to the defendant, this passage establishes that the agreements were to be in effect only during the two month period between August 26 and October 26 of 1974 and were to apply only to jobs obtained at the Port Hudson plant of Georgia-Pacific other than the job already commenced. For two reasons the court cannot accept this interpretation of the agreement.

First, the court does not believe that the plaintiff unions would have removed their picket line from Schafer's job-site for such a small consideration as the right to a union contract on work at that particular site which might be awarded to that particular contractor during a particular two month period. The record does not show that any work other than the gate house and administration building jobs was done at the Port Hudson site during the two month period involved, nor that there was ever any expectation that any such work would be done. In order to accept the defendant's interpretation of the agreement we would have to believe that the unions would withdraw a picket line already set up by them in return for the empty promise to use union labor on jobs that were never to be done.

Second, the agreements in question were dated October 26, 1974. Plaintiffs maintain, and the defendant has not denied, that they were actually signed on August 26, two months earlier. The unions' explanation of this is that Schafer expected to be finished with the Port Hudson job by October 26 and wished to complete that job on a non-union basis, since he had bid it non-union and could not meet his contract obligations on that job and pay union scale. He therefore, asked that the agreement be post-dated to October 26, so that he would not be bound to a union contract till after he had finished that particular job. The unions were agreeable to this arrangement, since they expected that Schafer would henceforth be a union contractor, but they wished to be assured that if Schafer obtained any other work than the Port Hudson job prior to the October 26 date, that work would be done under union auspices.

We find this a credible explanation of the meaning of this passage and accordingly find that the agreement was understood by all parties to mean, and does mean, that it was to apply to all jobs obtained by the Schafer company from October 26, 1974 onward, and to all jobs obtained by him except the Port Hudson, Georgia-Pacific job, between August 26 and October 26 of that year.

## ARE THE AGREEMENTS ENFORCE-ABLE?

The agreements in issue here are pre-hire agreements, a form of labor agreement unique to the construction industry. In all fields except the construction industry labor law condemns as an unfair labor practice the making of any agreement between an employer and any union which has not been certified as the majority representative of his employees. A limited exception is made for the construction industry because of the complete changes that are there made in the composition of the work force employed by an employer from job to job; and the need to know, in advance of hiring for a particular job, what the labor costs will be, see *N. L. R. B. v. Local U. No. 103, Intern. Ass'n, Etc.*, 434 U.S. 335, 347, 98 S.Ct. 651, 659, 54 L.Ed.2d 586 (1978). In the above case, the Supreme Court laid down the rule that a construction industry pre-hire agreement, while not an unfair labor practice, still has no legal force or effect until such time as the union can prove majority support at the particular construction site as to which it is sought to be enforced. "The employer's duty to bargain and honor the contract is contingent on the union attaining majority support at the various construction sites," *Local U. No. 103* above, 434 U.S. at 345, 98 S.Ct. at 658.

■ In this case, however, it is unnecessary to weigh the voluminous evidence submitted by the parties, mostly in the form of payroll records of the defendant contractor, to determine which jobs, if any, had union majorities employed subsequent to February 9, 1976; because on that date Mr. Schafer signed, on behalf of his company, a document authorizing the Associated General Contractors (A.G.C.) of Louisiana to act as his bargaining agent in negotiations with the plaintiff unions. This voluntary act of the defendant effectively merged his company with the other member companies of the Associated General Contractors as one large collective bargaining unit. Thenceforth, it became irrelevant whether a majority of Schafer's employees favored the union so long as a majority of those employed by the Associated General Contractors were union people. See, Authorized Air Conditioning Co., Pomona, Calif. and Sheet Metal Workers Local 509, Case No. 21–CA–15160, May 16, 1978, 236 NLRB No. 24; 98 LRRM 1538 where the Board held,

> The employer relied on Irvin-McKelvy Company, 194 NLRB 52, 78 LRRM 1516, and other cases concerning bargaining relationships under Section 8(f) of the Act. However, this reliance is misplaced, since no question of majority has been raised in the appropriate multi-employer unit, and the representative status of the union among the employer's employees is immaterial in view of the fact that these employees constitute only a small segment of the unit.

See also, Washington Refrigeration Service Co., 206 NLRB 852 (1973); Beck Engraving Co., Inc., 213 NLRB No. 13 (1974); Hub Pharmacy, Inc., 216 NLRB No. 11 (1975); and Siebler Heating & Air Conditioning, Inc., 219 NLRB No. 180 (1975). Here also, the employees of the Schafer Company comprise only a small minority of the total work force used by the Associated General Contractors. A.G.C. has a long history of collective bargaining with the plaintiff unions, and the majority status of the unions vis a vis the association has not here been questioned.

■ As to the period between the signing of these agreements by the defendant with the plaintiffs in 1974 and the 1976 adoption of the A.G.C. as defendant's bargaining agent, the evidence which can be sifted from the payroll records is only to the effect that at certain points in time the defendant employed union men and that sometimes a majority of his employees may have been union members. But this is insufficient to prove that at any particular time at any particular jobsite, the unions had a majority.

Following his execution of the agreements of 1974, the state of the law is such that Mr. Schafer was still at liberty to regard himself as a non-union contractor. He could be held to the agreements he had signed only if the union could prove it had a

majority at each jobsite as to which it sought to enforce them. See *Local U. No. 103*, above.

The unions' evidence relating to this period generally fails to associate any particular employee with any particular jobsite, so that the court is unable to form an opinion regarding the likely state of sentiment either for or against the union on particular jobs. Also, failure of the unions to contemporaneously protest alleged violations of the agreements or to seek to enforce compliance by suit or by exercising their right to provoke a representation election under the supervision of the NLRB indicates that either:

(1) The unions were unaware of the violations; or

(2) The unions were unsure of their majority.

If (1) is true, this would indicate that no one on the particular jobs complained to the union of failure to pay union scale or benefits; a state of affairs hardly consistent with the hypothesis that a majority of those at the jobsite regarded the unions as their representatives. If (2) is true, this court is inclined to rely on the unions' own assessment of their strength and to find that the existence of a union majority working on these jobs is not proved.

The court therefore finds that before February 9, 1976, there was no enforceable collective bargaining agreement between the defendant and the plaintiff unions. After that date the agreements were enforceable. The court further finds that the agreements in question continued in force until April 30, 1978, on which date, by joint stipulation of the parties entered in open court on the trial of this case on March 14, 1979, any and all agreements that may have existed between the parties were abrogated.

*DAMAGES*

■ Plaintiffs are entitled to judgment, for the benefit of the individual employees who were underpaid and of the pension funds that did not receive payments contractually due, in an amount equal to the difference between the amounts actually paid and those due under the contract. The records necessary to determine the parties to whom payments are due and the agreements under which they are due are available to and familiar to the parties. They are instructed to frame a judgment accordingly, which the court may adopt. Failure of the parties to agree upon the amounts due under the contracts for the period set out in our opinion, above, will result in the appointment by the court of a special master to determine the amount owed. The cost of the master will then be assessed to the parties equally or to the obdurate party, as the court may determine.

■ Further, the court finds an award of attorney's fees to the plaintiffs appropriate in this case. Even if we could not properly find bad faith in the defendant's refusal to honor an agreement to which he had set his name, since we have upheld his legal right to do just that in the peculiar context of pre-hire agreements, we can and do find bad faith in his refusal to honor those agreements once he had joined the Associated General Contractors, becoming party to the same collective bargaining agreements adhered to by the other member contractors. Plaintiffs are therefore instructed to submit and support a proposed award at the same time as the proposed judgment is submitted. Authority for the award of attorney's fees in this case is found in *Local U. No. 4, Int. Bro. of E. W. v. Radio Thirteen-Eighty, Inc.*, 469 F.2d 610 (CA 8—1972) and *U. S. Steelworkers of America v. Butler Manufacturing Co.*, 439 F.2d 1110 (CA 8—1971).

SUPPLEMENTAL AND AMENDING FINDINGS OF FACT, CONCLUSIONS OF LAW, AND REASONS FOR JUDGMENT

In our opinion which constituted our findings of fact, conclusions of law, and reasons for judgment dated January 22, 1980, and entered in the record of this case on January 24, 1980, we held the defendant, E. C. Schafer Construction Company, Inc. (Schafer), liable to the plaintiff unions under vari-

ous collective bargaining agreements and required counsel for the parties to compute the exact amounts owed in conformity with those agreements (as interpreted by the Court) and to jointly submit a proposed judgment consistent therewith. Counsel have complied with the Court's instructions with admirable thoroughness, but when submitting the proposed judgment, counsel raised several questions which now require clarification and to some extent modification of our findings of fact, conclusions of law, and reasons for judgment. To that end, this supplemental opinion will be filed in the record of this case, and, together with the original opinion, will constitute the basis for judgment in this case. In case of discrepancy between the original opinion and this supplemental opinion, the supplemental opinion will control.

I. Our original opinion makes express mention only of wage differentials and of Pension Fund benefits due under the labor agreements. The unions' Health and Welfare Fund and Apprenticeship Fund are not specifically mentioned. Since we found the contracts generally enforceable for the periods in question, all amounts due under their provisions must be paid, including the specified payments to the Health and Welfare Fund and the Apprenticeship Fund. It was our intention that those two Funds be included as was the Pension Fund.

■ II. The defendant now contends that some of the workers (J. O. Smith, Peter Harvey, Edward Watkins, Huey Welch, and Mike Schafer) were working as supervisors and should be excluded from coverage by the National Labor Relations Act. Defendant says that our opinion made no mention of such exclusion. The fact is that we did not intend to exclude those workers. Under the terms of the contract, the employer was obligated to obtain his carpenter foremen from the Union Hall and to pay them prescribed union wages. All benefits provided for in this opinion are due to those employees, including wages and payments to the various Funds involved.

■ III. Defendants further contend that seven employees, Manson Alexander,

Arnold Davis, Otha Glass, Bertel Loyd, Nolan Loyd, Martin Munson, and Donald Pechon, were carpenter helpers and not journeyman carpenters, and that they should be paid at the apprenticeship level and not as journeyman carpenters as claimed by plaintiffs. We conclude that the stipulation of the parties entered in the record of this case as to the classification of these workers forecloses further consideration of that question and that these employees must be paid at the rate for journeyman carpenters.

IV. Our finding that the collective bargaining agreements involved in this suit were enforceable rested upon the fact that Schafer became a part of a large multi-employer bargaining unit when he signed "a document authorizing the Associated General Contractors (A.G.C.) of Louisiana to act as his bargaining agent in negotiating with the plaintiff unions." It is now correctly pointed out to us by the defendant that this document (Joint Exhibit 23) appointed the A.G.C. Schafer's agent for negotiations *only* with the Carpenters' Union and the Operating Engineers' Union, and *not* with the Laborers' Union. Indeed, the letter of appointment, Joint Exhibit 23, listed several unions, including the Laborers' Union, and required a check mark to be placed by the defendant beside the specific unions with whom he authorized A.G.C. to bargain on his behalf. The only unions checked by the defendant are the Carpenters' Union and the Operating Engineers' Union. Laborers' Union is significantly left unchecked. We can only conclude from this undisputed evidence that the defendant did not intend, and indeed did not, appoint A.G.C. to bargain on its behalf with the Laborers' Union.

■ Since Schafer obviously never became a part of the A.G.C. multi-employer bargaining unit insofar as the Laborers' Union is concerned, that union, for reasons more specifically set forth in our original opinion, can enforce the pre-hire agreement which it signed with Schafer only by proving that it represented a majority of Schafer's laborer employees at each jobsite operated by Schafer. Absent such proof, the pre-hire agreements are unenforceable.

**540**

The evidence presented at the trial of this case shows that at least fifty men were employed by Schafer as laborers during the periods in question. Of these, the evidence showed only three to be union members. (See Tr. p. 37–8.) Furthermore, these three employees appear only to have worked for Schafer on the 1974–75 Georgia Pacific job. After that period, when the bulk of the work under the contracts here in question was carried out, it appears that none of the men employed by Schafer as laborers belonged to the Laborers' Union (Southeastern Louisiana Laborers District Council), or at least, there is no evidence to show that they did. Accordingly, the Laborers' Union's pre-hire agreement is not enforceable, and no sums whatsoever are due by the defendant pursuant thereto. While it is difficult to understand, and perhaps illogical to explain why the defendant would have appointed A.G.C. to represent it in negotiations with the Carpenters' Union and the Operating Engineers' Union and not with the Laborers' Union, nevertheless, the fact remains that the letter authorizing such negotiations is very specific and unambiguous, and permits such representation only with regard to those two Unions. We must assume, absent evidence to the contrary, that the failure to check the Laborers' Union as one with whom A.G.C. could negotiate on defendant's behalf was an act purposely and intentionally done by the defendant. A.G.C. was simply not authorized to act as defendant's agent in connection with negotiations with the Laborers' Union. We find as a matter of law that under the facts of this case, plaintiffs may not recover any funds from the defendant either as wages, pension fund benefits, health and welfare fund benefits, or apprenticeship fund benefits insofar as those employees classified as laborers are concerned.

V. The amount of attorney fee to be awarded to counsel for the plaintiffs was not specified. Counsel for the plaintiffs has now submitted his itemized statement of services rendered in this case, which shows a total of 81.5 hours of attorney time devoted to this case. Nothing in opposition to this statement has been filed by counsel for

the defendant, and after due consideration of this statement, the Court finds no reason to question it. While the preparation and trial of this matter was time-consuming, nevertheless, it was not of a particularly complicated nature and therefore, the Court concludes that compensation on an hourly basis is justified. While counsel for the plaintiffs suggests that part of the work should be paid for at $60.00 per hour, and part of it at a rate of $75.00 per hour, it is the opinion of the Court that compensation for the total time on the basis of $60.00 per hour would be fair and equitable. Therefore, the Court finds that the defendant should pay to the plaintiffs an attorney fee in the amount of $4,890.00, which should be incorporated as part of the judgment in this suit.

Upon receipt of a copy of these supplemental findings, counsel for both parties are hereby directed to confer, and to submit to the Court as soon as possible a new proposed judgment not inconsistent with the findings of the Court contained in both its original opinion and this supplemental opinion.