UNITED MINE WORKERS OF AMERICA, DISTRICT 4, United Mine Workers of America and Local Union No. 1846, unincorporated associations, Plaintiffs,

v.

OTIS ELEVATOR COMPANY, INC., a corporation, Defendant,

v.

INTERNATIONAL UNION OF ELEVATOR CONSTRUCTORS, Intervenor.

Civ. A. No. 80–140.

United States District Court,
W. D. Pennsylvania.

June 9, 1980.

---

Paul M. Puskar, Kuhn, Engle & Stein, Pittsburgh, Pa., for plaintiffs.

Richard Thomas, Thorp, Reed & Armstrong, Pittsburgh, Pa., Brian Powers, O'Donoghue & O'Donoghue, Washington, D. C., and Arthur Cutruzzula, Balzarini, Walsh & Maurizi, Pittsburgh, Pa., for defendant.

## MEMORANDUM OPINION

TEITELBAUM, District Judge.

Defendant Otis Elevator Company (hereinafter "Otis") entered into a labor agreement known as the National Coal Mine Construction Agreement with the plaintiffs (hereinafter "UMWA"). Article XXI of that agreement contains a mandatory grievance-arbitration procedure. This is an action by the UMWA, pursuant to Section 301 of the Labor Management Relations Act of 1947, as amended, 29 U.S.C. § 185, seeking to compel Otis to arbitrate a dispute which is allegedly subject to the grievance-arbitration provision of the agreement.

The labor agreement was executed by the UMWA and a district manager of Otis primarily responsible for the Kentucky, Indiana, and Illinois areas. Signing of the agreement occurred pursuant to the request of UMWA as a precondition to performing certain work on a Kentucky project. The district manager of Otis signed the agreement even though the authorized national union representative of Otis employees is the International Union of Elevator Con-

structors (hereinafter "IUEC")[1] and not the UMWA. When an allegedly arbitrable dispute arose on a Pennsylvania project, UMWA sought arbitration and Otis refused and continues to refuse.

UMWA's complaint sought a preliminary injunction to compel arbitration. By agreement of the parties on February 5, 1980, the case *sub judice* is now directed toward the appropriateness of permanent injunctive relief rather than merely preliminary relief. As such, the decision rendered herein operates as a final adjudication of the controversy.

■ The basic problem before this Court is whether or not there is a binding National contract between the UMWA and Otis which governs the Pennsylvania dispute. For the reasons which follow, this Court concludes that there is not such a binding contract and will dismiss the instant action.

The Court believes that there are three reasons which make the denial of UMWA's requested relief appropriate.

First, the district manager of Otis had no authority to bind Otis to a national union agreement. There is very little dispute that the district manager had no actual authority to conclude a national labor agreement. Such a function was far beyond the scope of his delegated responsibilities. The UMWA argues, however, that even if the district manager lacked actual authority, Otis should be bound nationwide because he had apparent authority.

■ Apparent authority serves to bind a principal to a third person when an agent acts in excess of his actual authority and the third person believes and has a right to believe that the agent was acting within his authority. Restatement of Agency 2d §§ 8, 27, 125 (1957). Thus, apparent authority cannot exist absent a reasonable belief on the part of the third person that the agent's actions are authorized by the principal. It was not possible for the UMWA to reasonably believe that a district manager could bind his company to a nationwide labor agreement. The evidence indicates that

there were no representations ever made by any Otis employee to the UMWA which would indicate that the district manager had the authority he purported to exercise by signing the agreement. Furthermore, the district manager specifically noted his limited authority by writing "Dist. Mgr." below his signature on the agreement and by listing the employer's address as the local Louisville office. A district manager in Kentucky, who ill advisedly signs a National Labor agreement merely so that a local job can be completed, does not bind employees in Pennsylvania where his contract signature explicitly calls attention to his limited authority. The evidence is such that the UMWA was put on notice and should have reasonably questioned the authority of the district manager. Its reliance on his authority was unjustified and unreasonable.

Secondly, even assuming that the district manager possessed authority of some type sufficient to bind Otis, the agreement is made unenforceable by the recent United States Supreme Court decision in *NLRB v. Iron Workers Local 103*, 434 U.S. 335, 98 S.Ct. 651, 54 L.Ed.2d 586 (1978).

The agreement in dispute between the UMWA and Otis is commonly known as a "pre-hire" agreement. A pre-hire agreement has as its parties a company and a union which does not represent a majority of the Company's employees. The mere execution of such an agreement would be an unfair labor practice but for the explicit exception of Section 8(f) of the Labor Management Relations Act. Section 8(f), 29 U.S.C. § 158(f), provides in relevant part:

"It shall not be an unfair labor practice under subsections (a) and (b) of this section for an employer engaged primarily in the building and construction industry to make an agreement covering employees engaged (or who, upon their employment, will be engaged) in the building and construction industry with a labor organization of which building and construction employees are members . .

1. The IUEC was granted permission to intervene in the instant lawsuit on March 26, 1980.

because (1) the majority status of such labor organization has not been established under the provisions of section 159 of this title prior to the making of such agreement . . ."

The enforceability of an 8(f) agreement was the subject of discussion in the *Local 103* decision.

The *Local 103* case held that an 8(f) agreement could not be enforced against the employer unless the union achieved majority status among the employer's workers. The agreement, absent such majority support, was viewed as only a preliminary step which envisioned further action for the development of a complete bargaining relationship. The Supreme Court, therefore, considers 8(f) to create more of an arrangement than an agreement as the term agreement is commonly understood.

Fortunately, the *Local 103* decision, while itself addressed to unfair labor charges arising from picketing, specifically answers the question of enforceability in a § 301 action such as the instant case. The Court held:

"The union argues that the Board's position permitting an employer to repudiate a pre-hire agreement until the union attains majority support renders the contract for all practical purposes unenforceable, assertedly contrary to this Court's decision in *Retail Clerks International Assn. v. Lion Dry Goods, Inc.*, 369 U.S. 17 [82 S.Ct. 541, 7 L.Ed.2d 503] (1962). There, the Court's opinion recognized that § 301 of the National Labor Relations Act confers jurisdiction on the federal courts to entertain suits on contracts between an employer and a minority union, as well as those with majority-designated collective-bargaining agents. Section 8(f) contracts were noted as being in this category. The Court was nevertheless speaking to an issue of jurisdiction. That a court has jurisdiction to consider a suit on a particular contract does not suggest that the contract is enforceable. It would not be inconsistent with *Lion Dry Goods* for a court to hold that the union's majority standing is subject to litigation, in a § 301 suit to enforce a

§ 8(f) contract, just as it is in a § 8(a)(5) unfair labor practice proceeding, and that absent a showing that the union is the majority's chosen instrument, the contract is unenforceable." 434 U.S. at 351–52, 98 S.Ct. at 661.

The United States Supreme Court has clearly delineated the standards to be followed in resolving the case *sub judice.* If the UMWA were the majority representative of Otis employees, the 8(f) agreement would be enforceable. The majority representative of Otis employees, however, has been and continues to be the IUEC. Accordingly, even assuming that the district manager of Otis could legitimately enter into a National agreement with the UMWA, such an agreement would be unenforceable due to the UMWA's lack of majority support by Otis employees.

Lastly, the *Local 103* decision emphasized that an 8(f) agreement must be voluntarily executed. "Congress was careful to make its intention clear that pre-hire agreements were to be arrived at voluntarily, and no element of coercion was to be admitted into the narrow exception being established to the majority principle." 434 U.S. at 348, 98 S.Ct. at 659. The UMWA in the instant case represented that unless Otis signed a National agreement, it could not perform any work on the Kentucky project. The coercion is apparent and substantial. In fact, there can be little doubt that this "do it our way or don't do it" ultimatum was the cause of the district manager signing an agreement which he should not have signed and probably would not have otherwise signed. There really never existed a valid 8(f) agreement between the UMWA and Otis because of the absence of voluntary consent.

For the foregoing reasons, judgment will be entered in favor of Otis and against the UMWA and the instant action dismissed. The foregoing shall constitute findings of fact and conclusions of law as required by Federal Rule of Civil Procedure 52(a). An appropriate Order will issue.