941 F.2d 1326
 138 L.R.R.M. (BNA) 2396, 120 Lab.Cas. P 10,971
 LOCAL UNION 60, UNITED ASSOCIATION OF JOURNEYMEN &
APPRENTICES OF the PLUMBING & PIPEFITTING INDUSTRY
OF the UNITED STATES AND CANADA,
AFL-CIO, Petitioner-Cross Respondent,
v.
NATIONAL LABOR RELATIONS BOARD, Respondent-Cross Petitioner.
 No. 90-4612.
 United States Court of Appeals,
Fifth Circuit.
 Sept. 19, 1991.
 
 William Lurye, Jerry L. Gardner, Jr., Gardner, Robein, & Urann, Metairie, La., for petitioner-cross respondent.
 David Seid, Aileen Armstrong, Deputy Assoc. Gen. Counsel, N.L.R.B., Washington, D.C., Hugh Frank Malone, Reg. Director, Region 15, N.L.R.B., New Orleans, La., for respondent-cross petitioner.
 Petition for Review and Cross Application for Enforcement of an Order of the National Labor Relations Board.
 Before KING and JOLLY, Circuit Judges.*
 E. GRADY JOLLY, Circuit Judge:
 
 
 1
 ITMC Corporation is a Louisiana-based company that fabricates and installs structural steel and piping. In July of 1987, it filed an unfair labor practice charge against Local Union No. 60, United Association of Journeymen and Apprentices of the Plumbing and Pipefitting Industry of the United States and Canada ("the Union"), alleging a violation of § 8(b)(1)(B) of the National Labor Relations Act ("NLRA"). Specifically, ITMC charged that, by fining and expelling two ITMC superintendents, the Union had unlawfully interfered with the company's selection of collective bargaining and grievance adjustment representatives. The National Labor Relations Board ("the Board") agreed and on August 10, 1990, entered an appropriate order. The Union now asks that we review and set aside this order; in its cross-application, the Board requests enforcement. For reasons that follow, we enforce the order.
 
 
 2
 * We begin by recounting the ALJ's findings of fact, as adopted by the Board. ITMC was first organized in August 1986 and was incorporated shortly thereafter. At its inception, it employed a number of former employees of the Gaffney Company, a then-defunct enterprise that had had a collective bargaining agreement with the Union.
 
 
 3
 Although the Union had no collective bargaining agreement with ITMC, it had hopes of negotiating one. In keeping with these hopes, the Union held a meeting in early 1987 at which it encouraged its members to sign on with ITMC. The plan, of course, was to populate ITMC's workforce, thus making it easier for the Union to organize the company's employees and, eventually, to reach a collective accord.
 
 
 4
 Several Union members eventually received and accepted offers of employment from ITMC, including Donald Bennett and John Heard. The company hired Heard to be its site superintendent at its Mississippi River Alcohol facility in Myrtle Grove, Louisiana; Bennett assumed an identical role at a different facility, the Tenneco Oil Refinery in Chalmette, Louisiana. As site superintendents, their responsibilities were broad. Both men exercised the authority to hire, fire, lay off, and discipline employees. Both men determined the need for overtime duty and, when necessary, selected employees to fill it. Both men granted pay raises and set wage scales (within company limits) for the rank-and-file employees.
 
 
 5
 And perhaps most significantly, both men handled employee complaints on a daily basis. For instance, Bennett and Heard resolved payroll disputes, such as a claim that a paycheck did not accurately reflect the number of hours worked or the proper rate of pay. To cite another example, the two investigated the complaints of "helpers" who claimed "journeyman" status, reclassifying the aggrieved employees where appropriate. Resolution of safety and sanitation complaints from employees also fell within their duties.
 
 
 6
 In early March, some two weeks after its early 1987 meeting, the Union launched its organization campaign by soliciting ITMC employees to sign Union authorization cards. Although Union Vice President and International Organizer Philip Miller was the spearhead of this movement, many Union officers and members contributed to the drive. Bennett was one such contributor: Upon being asked by Robert Jaeger, Union Business Manager, he passed out scores of cards at the Tenneco site, garnering several signatures.
 
 
 7
 The Union did not limit its efforts to this grass roots strategy. Beginning at about the time of the organization campaign, Jaeger twice met with Ian Foster, ITMC's Vice President of Construction and de facto chief executive officer, and lobbied for the company to follow in Gaffney's tracks and join in a collective bargaining agreement. The meetings ended inconclusively, with Foster expressing concerns about the prospect of entering into a pact but stopping short of ruling out such an option.
 
 
 8
 In April or May, Bennett and Heard reported to Foster that the Union in general and Miller in particular were engaged in an organization drive at their respective facilities, something of which the company vice president was previously unaware. Upon learning of the campaign, Foster told Heard to meet with Miller and "find out what he wants," but cautioned him not to reach any agreements. Heard complied with these instructions, meeting three times with Miller in early June but making no commitments.
 
 
 9
 After these meetings but still in June, Foster himself met with Miller to discuss, again, the possibility of a collective bargaining agreement. Foster reiterated his misgivings but offered to enter an agreement covering the Tenneco facility and proposed a base wage of $11.50 per hour; Miller, after pushing for $12.46 hourly wage, said he would take the offer to the Union membership and then get back in touch with Foster. On that note, the meeting adjourned.
 
 
 10
 Shortly thereafter, however, Foster got wind of rumors regarding a Union plan to set up picket lines at ITMC sites. He phoned Miller and asked why he had not responded to the company's offer and whether the rumors were well-founded; Miller replied that the Union could not accept a wage of less than $12.46 an hour. The conversation ended with Foster stating that he would interpret a picket line at any ITMC facility "as a categoric 'No' against the proposals."
 
 
 11
 On June 30, the Union established picket lines at the Mississippi River and Tenneco sites. Bennett and Heard crossed the line at their respective sites to perform their regular supervisory duties. As the Union began picketing at Tenneco, Bennett and a co-worker met with Miller and Jaeger and tried, fruitlessly, to resolve the differences between ITMC and the Union. Later that day, Bennett sought and received permission from Foster to arrange a formal meeting, scheduled for July 3, between ITMC and Union officials. For his part, Heard spoke with Union President Charles Mouledous on the second or third day after picketing had begun at Mississippi River, questioning among other things the need for a picket line.
 
 
 12
 On July 3, the Union filed internal charges against Bennett, Heard, and other Union members who had crossed the picket lines, alleging that, by working for a contractor not signatory to a collective bargaining agreement with the Union, they had violated Article Seven of the Union's constitution. Later that same day, as planned, Foster and Bennett met with Jaeger, Miller, Mouledous, and the Union's Business Agent. The meeting was unproductive, ending with a promise by Foster to contact the Union after reviewing its latest demands. As for the internal charges, Jaeger told Bennett that all charges would be dropped if ITMC signed on with the Union.
 
 
 13
 ITMC officials, however, rejected the Union's July 3 proposals, notifying the Union on July 21 of its decision. This time the Union conceded defeat; on July 29, it called off the picketing and sent ITMC a telegram in which it renounced any interest in representing its employees. The proceedings against Bennett and Heard, on the other hand, continued apace. On July 27, while the picketing was still in progress, a Union trial board tried the two superintendents. On August 3, after the picketing had stopped, the trial board found them guilty, fined each $2,000, and expelled them from the Union. The Union's parent, International Union, affirmed the penalties.
 
 II
 
 14
 On November 27, 1987, the Regional Director for the Fifteenth Region of the Board issued a complaint, charging the Union with having violated § 8(b)(1)(B) of the NLRA. In its December 10, 1987 answer, the Union denied wrongdoing and, specifically, denied that Heard and Bennett were representatives within the scope of § 8(b)(1)(B).
 
 
 15
 On June 23, 1988, the Administrative Law Judge rendered his decision. He found that Bennett and Heard were, for purposes of collective bargaining and grievance adjustment alike, ITMC "representatives" subject to § 8(b)(1)(B). This finding paved the way for his ultimate holding: that the Union had violated § 8(b)(1)(B) by charging, trying, and eventually fining and expelling Bennett and Heard. The Union filed timely exceptions to the ALJ's decision, challenging inter alia his finding that Bennett and Heard fell within § 8(b)(1)(B). The Board's general counsel also filed an exception, seeking to broaden what he took as an insufficiently narrow proposed remedy.
 
 
 16
 In its August 10, 1990 decision, the Board affirmed the ALJ's conclusion that Bennett and Heard were "grievance adjusters," noting that, among other things, they "regularly adjusted employee complaints about ... payroll matters." While aware that these "payroll matters" were "not technically contract grievances," the Board added that such matters were "exactly the types of disputes that would most likely be contractual grievances if there was a collective-bargaining agreement in existence." In so concluding, the Board thought it "unnecessary" to rely on the ALJ's alternative rationale that Bennett and Heard were grievance adjusters under § 8(b)(1)(B) owing to their handling of "personal complaints." Similarly, in light of its own "grievance adjuster" conclusion, the Board saw no reason "to pass on the [ALJ's] further findings that [Bennett and Heard] also served as collective bargaining representatives for [ITMC]."
 
 
 17
 To remedy the § 8(b)(1)(B) violation, the Board issued an order that, at base, requires the Union to stop engaging in the unfair labor practice. The order also mandates that the Union not restrain or coerce ITMC "in any like or related manner" and, affirmatively, compels it to rescind and expunge from its records the disciplinary action it took against the two superintendents.
 
 III
 
 18
 The relevant text of § 8(b)(1)(B) provides that "[i]t shall be an unfair labor practice for a labor organization ... to restrain or coerce ... an employer in the selection of his representatives for the purposes of collective bargaining or the adjustment of grievances." We further note that this section is violated not only by "direct actions aimed at [the employer] but also by debilitating [union] discipline imposed on his collective-bargaining or grievance-adjustment representative." American Broadcasting Co. v. Writers Guild of America, West, Inc., 437 U.S. 411, 429, 98 S.Ct. 2423, 2433, 57 L.Ed.2d 313 (1978) ("ABC").
 
 
 19
 Also by way of introduction, we observe that the Board's order demands deference. "The function of striking [the] balance to effectuate national labor policy is often a difficult and delicate responsibility, which the Congress committed primarily to the [Board], subject to limited judicial review." ABC, 98 S.Ct. at 2434, quoting NLRB v. Truck Drivers, 353 U.S. 87, 96, 77 S.Ct. 643, 647, 1 L.Ed.2d 676 (1957). See also Florida Power & Light Co. v. International Brotherhood of Electrical Workers, Local 641, 417 U.S. 790, 94 S.Ct. 2737, 2750, 41 L.Ed.2d 477 (1974) ("[Courts] should not impose [their] views on the Board as long as it stays within the outer boundaries of the statute it is charged with administering"). Accordingly, we are to enforce the order if it represents a reasonable interpretation of the NLRA and is undergirded by substantial evidence. See ABC, 98 S.Ct. at 2438; Pattern Makers' League of North America v. NLRB, 473 U.S. 95, 105 S.Ct. 3064, 3068, 87 L.Ed.2d 68 (1985); 29 U.S.C. § 160.
 
 IV
 
 20
 The issue before us is whether the Union, by disciplining Bennett and Heard for performing work for a contractor with whom it had no collective bargaining agreement, coerced or restrained ITMC in its selection of grievance adjustors. We decide this issue against the backdrop of three Supreme Court decisions, which we discuss presently: Florida Power, ABC, and NLRB v. IBEW Local 340, 481 U.S. 573, 107 S.Ct. 2002, 95 L.Ed.2d 557 (1974).
 
 
 21
 We begin our analysis, however, with some background on § 8(b)(1)(B). The section was enacted in 1947 "to prevent a union from exerting direct pressure on an employer to force it into a multiemployer bargaining unit or to dictate its choice of representatives for the settlement of employee grievances." Local 340, 107 S.Ct. at 2007; see also S.Rep. No. 105, 80th Cong., 1st Sess., pt. 1, p. 21 (1947). For more than two decades after § 8(b)(1)(B)'s passage, the Board construed it as applying only to those cases implicating this narrow purpose. In 1968, however, the Board "significantly expanded the reach of § 8(b)(1)(B), with its decision in San Francisco-Oakland Mailers' Union No. 18 (Northwest Publications, Inc.), 172 N.L.R.B. 2173." Florida Power, 94 S.Ct. at 2742. The Oakland Mailers doctrine, as it came to be known, provided that, when a union disciplined an employer's representative for the manner in which he performed his § 8(b)(1)(B) duties, the union indirectly coerced the employer and thus violated § 8(b)(1)(B). Subsequent Board decisions stretched the Oakland Mailers principle to the point that "Section 8(b)(1)(B) became, in the eyes of the Board, 'a general prohibition of a union's disciplining supervisor-members for their conduct in the course of representing the interests of their employers.' " Florida Power, 94 S.Ct. at 2743, quoting Toledo Locals Nos. 15-P & 272, Lithographers & Photoengravers International (Toledo Blade Co., Inc.), 175 N.L.R.B. 1072, 1080 (1969), enforced, 437 F.2d 55 (6th Cir.1971).
 
 
 22
 Florida Power represented a retrenchment from the Board's ever-expanding view of § 8(b)(1)(B). There, the union fined and expelled supervisor-members who had crossed a picket line to perform rank-and-file work. The Board ruled that in so doing the union had violated § 8(b)(1)(B), citing Oakland Mailers and later Board decisions. The Court, however, disagreed, and affirmed the judgment of the Court of Appeals denying enforcement. The rationale behind the majority opinion is as follows:
 
 
 23
 The conclusion is thus inescapable that a union's discipline of one of its members who is a supervisory employee can constitute a violation of § 8(b)(1)(B) only when that discipline may adversely affect the supervisor's conduct in performing the duties of, and acting in his capacity as, grievance adjuster or collective bargainer on behalf of the employer.
 
 
 24
 We may assume without deciding that the Board's Oakland Mailers decision fell within the outer limits of this test, but its decisions in the present cases clearly do not. For it is certain that these supervisors were not engaged in collective bargaining or grievance adjustment, or in any activities related thereto, when they crossed union picket lines during an economic strike to engage in rank-and-file struck work.
 
 
 25
 Florida Power, 94 S.Ct. at 2744-2745.
 
 
 26
 The facts of ABC vary slightly but importantly from those of Florida Power. During a strike, several supervisor-members crossed a picket line to perform their ordinary supervisory tasks, among them grievance adjustment. The Union--which had a collective bargaining relationship with the employer both before and after the strike--charged these supervisor-members with crossing a picket line, working for an employer against whom the union was on strike, and refusing to perform picket duties; those found guilty were subject to fines, suspensions, and in some cases expulsions. The Board ruled that by disciplining the working supervisor-members the union had violated § 8(b)(1)(B) under the "adverse effect" test of Florida Power. The Court, mindful of the deference it owed the Board, agreed:
 
 
 27
 [We do not mean] to say that every effort by a union to discipline a supervisor for crossing a picket line to do supervisory rather than rank-and-file work would satisfy the standards specified by FP & L, or that on facts present where there is necessarily a violation of § 8(b)(1)(B). But we are of the view that the Board correctly understood FP & L to mean that in ruling upon a § 8(b)(1)(B) charge growing out of union discipline of a supervisory member who elects to work during a strike, it may--indeed, it must--inquire whether the sanction may adversely affect the supervisor's performance of his collective-bargaining or grievance-adjustment tasks and thereby coerce or restrain the employer contrary to § 8(b)(1)(B). The Board addressed those issues here, and if its ultimate factual conclusions in this regard are capable of withstanding judicial review, it seems to us that its construction of the section fairly recognizes and respects the outer boundaries established by FP & L, and represents an "acceptable reading of the statutory language and a reasonable implementation of the purposes of the relevant statutory sections." NLRB v. Iron Workers, 434 U.S. 335, 441, 98 S.Ct. 651, 656, 54 L.Ed.2d 586 (1978).
 
 
 28
 ABC, 98 S.Ct. at 2434 (emphasis in original). As for the Oakland Mailers doctrine, the Court expressly "declined the invitation to overrule" it. Id. 98 S.Ct. at 2437.
 
 
 29
 The final case in this trilogy, Local 340, posed the question of whether a union violates § 8(b)(1)(B) "when it disciplines a supervisor union member who does not participate in collective bargaining or adjust contractual grievances, and whose employer has not entered into a collective-bargaining agreement with the union." Local 340, 107 S.Ct. at 2005. The Board found a violation on these facts, relying on the so-called "reservoir doctrine" to conclude that the disciplined supervisors were § 8(b)(1)(B) representatives. The Court described the doctrine thus:
 
 
 30
 Under the reservoir doctrine, the National Labor Relations Board (NLRB or Board) expansively interprets the phrase "representativ[e] for the purposes of collective bargaining or the adjustment of grievances" to include all supervisors within the meaning of § 2(11), on the ground that "such individuals form the logical 'reservoir' from which the employer is likely to select his representatives for collective bargaining or grievance adjustment." [27 N.L.R.B. 995, 997 (1984) ] The fact that a supervisor might be selected to perform these tasks in the future is therefore sufficient to classify him or her as a § 8(b)(1)(B) representative.
 
 
 31
 Local 340, 107 S.Ct. at 2006. The Court, however, denied enforcement, in part owing to its view of the reservoir doctrine:
 
 
 32
 Accordingly, we conclude that discipline of a supervisor member is prohibited under § 8(b)(1)(B) only when that member is engaged in § 8(b)(1)(B) activities--that is, collective bargaining, grievance adjustment, or some other closely related activity (e.g., contract interpretation, as in Oakland Mailers ).
 
 
 33
 One obvious ramification of this conclusion is that § 8(b)(1)(B) prohibits discipline of only those supervisor-members who actually perform § 8(b)(1)(B) duties. Clearly a supervisor cannot be disciplined for acts or omissions that occur during performance of § 8(b)(1)(B) duties if he or she has none. We therefore reject the NLRB's "reservoir doctrine," on which the Court of Appeals relied.
 
 
 34
 Local 340, 107 S.Ct. at 2010. The Court was also swayed by the fact that the union neither had nor sought a collective bargaining agreement with the employer, holding that this made "the possibility that the Union's discipline will coerce [the employer] too attenuated to form the basis of an unfair labor practice charge." Id. at 2012.
 
 
 35
 In the light of these holdings, we ourselves hold that the instant appeal falls within the ambit of and thus is controlled by ABC. The similarities between the two cases are many: Both involve supervisors who were disciplined by their union for crossing a picket line to perform grievance adjustment tasks for an employer with whom the union had no collective bargaining agreement.[1] This is not to say, of course, that the cases are utterly indistinguishable; concededly, differences exist. Our cursory sketch of applicable Supreme Court precedent, however, reflects only poorly the legal jumble that is § 8(b)(1)(B), and this disarray makes us especially hesitant to stray from the high court's trail.
 
 
 36
 Anticipating our reliance on ABC, the Union makes various arguments in an effort to distinguish the instant case. It is to these arguments that we now turn.
 
 
 37
 * Initially, the Union insists that "representative for the ... adjustment of grievances" as used in § 8(b)(1)(B) is a term of art referring not to the handling of complaints generally but, rather, to "the explicit step-by-step procedures ... set forth in [a] collective bargaining agreement for resolving contract disputes." Alternatively stated, the Union's view is that neither Bennett nor Heard was a § 8(b)(1)(B) grievance adjustor, because an employee cannot adjust grievances within the meaning of § 8(b)(1)(B) unless his employer is a signatory to a collective bargaining pact.
 
 
 38
 This argument does nothing to render ABC inapposite. Indeed, the ABC Court upheld the Board's finding that the respective union had violated § 8(b)(1)(B) by disciplining supervisors who, in the absence of a collective bargaining agreement, had crossed a picket line in part to perform § 8(b)(1)(B) grievance adjustment duties. ABC, 98 S.Ct. at 2426-2430. What is more, in Local 340, 481 U.S. at 590, 107 S.Ct. at 2012 (emphasis added), the Court stated that union discipline of employees violates § 8(b)(1)(B) only in those situations where the union either has or is "seek[ing] to establish" a collective bargaining agreement with the employer. This declaration indicates that an employer can be illegally coerced or restrained under § 8(b)(1)(B) when no collective bargaining agreement is in place, which in turn provides some authority that grievance adjustment may likewise precede such a collective contract.
 
 
 39
 We further note that the two supporting arguments the Union offers to support its restrictive interpretation of grievance adjustor are flawed. Primarily, the Union relies on statutory interpretation. It invokes three other sections of the NLRA, all of which allegedly "lead to the conclusion that Congress intended the term 'grievance adjustment' to be interpreted narrowly as referring to grievance procedures established in a collective bargaining agreement." The first two of these sections--29 U.S.C. § 173(d) and 29 U.S.C. § 171(c)--supposedly compel such a conclusion by virtue of the fact that they refer to grievance adjustment in the context of collective bargaining.[2] As concerns the third provision--29 U.S.C. § 152(11), which defines "supervisor"--the Union's argument here (to the extent we understand it) is that a definition of grievance adjustment that includes personal complaints is impermissible because it would treat all "supervisors" as "grievance adjustors," something Local 340 supposedly forbids.[3] With respect to §§ 173(d) and 171(c), however, NLRA sections other than § 8(b)(1)(B) refer to grievance adjustment without mentioning collective bargaining pacts--for instance, 29 U.S.C. § 152(11). Furthermore, the fact that § 8(b)(1)(B) refers only to "grievance adjustment" while provisions like §§ 173(d) and 171(c) refer to "grievance adjustment" alongside the words "collective bargaining agreement" cuts, under the doctrine of expressio unius, against the Union rather than for it. As for the Union's § 152(11) argument, it ignores the fact that the Board's findings never defined grievance adjustment so as to include personal grievances.
 
 
 40
 The Union's other supporting argument--that the Court's disavowal of the "reservoir doctrine" in Local 340 "is further evidence ... that supervisors cannot be 'grievance adjusters' without a collective bargaining agreement"--is no more persuasive. By rejecting this Board effort to widen the swath of § 8(b)(1)(B), the Local 340 Court simply required that a § 8(b)(1)(B) grievance adjuster actually--as opposed to prospectively--perform grievance adjustment "tasks." Id. 107 S.Ct. at 2010 ("... § 8(b)(1)(B) prohibits discipline of only those supervisor-members who actually perform § 8(b)(1)(B) duties"). As can be plainly seen, that requirement in no way bears upon the issue of whether it is possible to adjust grievances absent a collective bargaining agreement.
 
 B
 
 41
 Even if Bennett and Heard were grievance adjustors, the Union next contends that Local 340--decided after ABC--modified the Florida Power adverse effect test[4] so that § 8(b)(1)(B) now proscribes discipline only when it is meted out in retaliation for § 8(b)(1)(B) conduct. Alternatively stated, according to the Union's reading of Local 340, § 8(b)(1)(B) does not apply unless an employee is being punished because of his collective bargaining or--in this case--his grievance adjusting. Since Bennett and Heard were sanctioned because they worked for a non-collective bargaining agreement employer--not because of the way in which they adjusted grievances--the Union concludes that it skirted § 8(b)(1)(B).
 
 
 42
 In support of its reading of Local 340, the Union points to the following language:
 
 
 43
 In Florida Power, ... [t]he Court held that § 8(b)(1)(B) cannot be read to prohibit discipline of employer representatives for performance of rank-and-file work during a strike. The decision created a restrictive 'adverse effect' test to determine when § 8(b)(1)(B) is violated:
 
 
 44
 "The conclusion is thus inescapable that a union's discipline of one of its members who is a supervisory employee can constitute a violation of § 8(b)(1)(B) only when that discipline may adversely affect the supervisor's conduct in performing the duties of, and acting in his capacity as, grievance adjuster or collective bargainer on behalf of the employer." 417 U.S., at 804-805, 94 S.Ct., at 2745.
 
 
 45
 ... The Court's language [in Florida Power ] implicitly limited the application of the adverse effects test: an adverse effect on future § 8(b)(1)(B) activities exists only when an employer-representative is disciplined for behavior that occurs while he or she is engaged in 8(b)(1)(B) duties--that is, "collective bargaining or grievance adjustment, or ... any activities related thereto...." [T]he general impact of union discipline on an § 8(b)(1)(B) representative's loyalty to the employer is insufficient to create a § 8(b)(1)(B) violation.
 
 
 46
 Local 340, 107 S.Ct. at 2008-2009 (all emphases added by Local 340 Court).
 
 
 47
 We reject this argument. Under the Union's interpretation of Local 340, the holding in ABC--that disciplining a supervisor-member for inter alia crossing a picket line violates § 8(b)(1)(B) when the supervisor-member crosses to perform grievance adjustment work--would be discredited law. In no uncertain terms, however, the Local 340 Court stated that ABC was perfectly consistent with the adverse effect test of Florida Power:
 
 
 48
 In ABC, therefore, the Board found, and the Court agreed, that the union fines of employer representatives engaged in grievance adjustment would have an adverse effect on the supervisor-member's future performance of that same § 8(b)(1)(B) duty. This holding is consistent with the analysis of the Court in Florida Power--that § 8(b)(1)(B) forbids only discipline for acts or omissions that occur while an employer representative is engaged in § 8(b)(1)(B) activities.
 
 
 49
 Local 340, 107 S.Ct. at 2010 (emphasis in original). Local 340, therefore, could not possibly have read the Florida Power adverse effect test as demanding, as the Union suggests, discipline in retaliation for § 8(b)(1)(B) conduct.
 
 C
 
 50
 Third, the Union attempts to sever this case from ABC by arguing that, even if the Florida Power adverse effect test does not require a union to discipline on account of § 8(b)(1)(B) conduct, the punishment of Bennett and Heard did not have the requisite adverse effect on their performance of § 8(b)(1)(B) duties. In this regard, it cites two differences between the facts of ABC--where the Court found substantial evidence to support the Board's adverse effect finding--and the instant facts: (1) here, the picketing period was brief and unaccompanied by a strike; and (2) five days before Bennett and Heard were found guilty, the Union filed a disclaimer of interest, which according to the Union "necessarily preclude[d] any § 8(b)(1)(B) violation."
 
 
 51
 Upon reviewing the record in its entirety, we are convinced that the Board's finding of adverse effect enjoys the backing of substantial evidence. In so concluding, we stress that our review of such a finding is highly circumscribed. "The inquiry whether union conduct would or might adversely affect the performance of ... grievance adjustment duties is ... necessarily a matter of probabilities, and its resolution depends much on what experience would suggest are the justifiable inferences from the known facts. This seems ... to be peculiarly the kind of determination that Congress has assigned to the Board, ... [whose findings in this area] are 'entitled to the greatest deference ...' " ABC, 98 S.Ct. at 2435, 2436 (quoting American Shipbuilding Co. v. NLRB, 380 U.S. 300, 316, 85 S.Ct. 955, 966, 13 L.Ed.2d 855 (1965)).
 
 
 52
 Neither of the differences to which the Union draws our attention demands a different result. The lack of a strike and the short picketing period are more than offset by the express promise by the Union to drop the charges against Bennett and Heard in return for recognition--something missing from ABC.[5] As for the second point, the Board, recognizing that Local 340 reads § 8(b)(1)(B) as requiring that a union either have or be seeking a collective bargaining agreement at the time it imposes punishment, concluded that "the coercive effect of the [Union's] action against Bennett and Heard had already been effectuated" by the time of the July 29 disclaimer.[6] To the extent that the Union contends that its disclaimer somehow sanitized this earlier violation, it places a gloss on the Local 340 collective bargaining agreement requirement. That case holds that, barring such an agreement or an attempt to secure one, there can be no adverse effect on the performance of § 8(b)(1)(B) duties; it does not hold that a union can breach § 8(b)(1)(B) and yet elude sanctions simply by disclaiming interest. See Local 340, 107 S.Ct. at 2012-2015.
 
 D
 
 53
 As its fourth argument, the Union contends that ITMC was free to force Bennett and Heard to resign from the Union, and that therefore the discipline heaped upon them could not have restrained or coerced ITMC. Although the Court in ABC rejected a similar argument in part because the union in that case barred its members from resigning during a strike, "[t]he law has since changed." Local 340, 107 S.Ct. at 2015. The Union claims two Court decisions were responsible for this change: Pattern Makers, 105 S.Ct. at 3064, which upheld a Board order striking down union restrictions on the right to resign; and Local 340, which according to the Union interprets Pattern Makers as making it all but impossible for union discipline to implicate § 8(b)(1)(B).
 
 
 54
 Irrespective of this argument's merit, however, we reject it on the ground that the Union raises it here for the first time. Absent extraordinary circumstances--and on this record we see none--the failure to raise an argument before the Board leaves us without jurisdiction to consider that argument. Gulf States Manufacturing, Inc. v. NLRB, 704 F.2d 1390, 1395-1397 (5th Cir.1983), reh'g denied, 715 F.2d 1020; 29 U.S.C. § 160(e).
 
 E
 
 55
 Lastly and haltingly, the Union argues that it did not violate § 8(b)(1)(B) because it harbored no intent to coerce or restrain Bennett and Heard. This too, however, appears to be a new argument; moreover, the Union cites no persuasive authority for the view that § 8(b)(1)(B) requires such an intent. Accordingly, we deem this argument meritless as well.
 
 V
 
 56
 For the foregoing reasons, we DENY the Union's request to set aside the order and GRANT the Board's petition for enforcement.
 
 
 
 *
 Because of his death on June 11, 1991, Judge Rubin did not participate in this decision. The case is being decided by a quorum. 28 U.S.C. § 46(d)
 
 
 [1]
 Technically, Bennett and Heard were disciplined because they worked for a contractor not signatory to a collective bargaining agreement, whereas the supervisors were punished for a variety of transgressions, including crossing a picket line. If anything, however, this difference cuts in favor of the Board's order, because Bennett and Heard--unlike the supervisors in ABC--were actually punished because of their (grievance adjustment) work
 
 
 [2]
 29 U.S.C. § 173(d) provides that "[f]inal adjustment by a method agreed upon by the parties is declared to be the desirable method for settlement of grievance disputes arising over the application or interpretation of an existing collective bargaining agreement." The policy of the United States, as expressed in 29 U.S.C. § 171(c), is to assist employers and employee representatives "in formulating for inclusion within [collective bargaining] agreements provision ... for the final adjustment of grievances...."
 
 
 [3]
 29 U.S.C. § 152(11) defines as a "supervisor" "any individual having authority, in the interest of the employer, to hire, transfer, suspend, lay off, recall, promote, discharge, assign, reward, or discipline other employees or responsibly to direct them, or to adjust their grievances, or effectively to recommend such action...."
 
 
 [4]
 See Maj. op. pages 1331-32, supra
 
 
 [5]
 We acknowledge that the Board found that the Union had coerced ITMC in its selection of grievance adjustors, not that the Union had coerced the company vis-a-vis its collective bargaining representatives. Nevertheless, the Union's willingness to toss out the charges in exchange for a collective bargaining agreement indicates that the Union is not above using internal discipline as a lever against an employer
 
 
 [6]
 The Union attacks this conclusion as well, contending that it illegitimately equates a charge of wrongdoing with disciplinary action. We think, however, that the conclusion is the product of a reasonable interpretation of § 8(b)(1)(B)
 We so hold in part because of language in ABC. In finding that substantial evidence bolstered the Board's order, the ABC Court used words that may reasonably be read as making a formal finding of guilt unnecessary:
 "These penalties were meted out at least in part because the accused [supervisors] had complied with the orders of their employers by reporting for work and performing only their normal supervisory functions, including the adjustment of grievances, during the strike. [Supervisors] who worked were thus faced not only with threats but also with the actuality of charges, trial, and severe discipline simply because they were working at their normal jobs. And if this were not enough, they were threatened with a union blacklist that might drive them from the industry." ABC, 98 S.Ct. at 2436 (emphasis in original).